Ralph E. SMITH, Jr., Plaintiff,

v.

DELAWARE BAY LAUNCH SERVICE,
INC., Defendant.

Civil Action No. 92–336–SLR.

United States District Court,
D. Delaware.

Aug. 14, 1997.

Peter E. Hess, Wilmington, DE, for Plaintiff.

Michael B. McCauley, Palmer, Biezup & Henderson, Wilmington, DE, (Richard Q. Whelan, David P. Thompson, Palmer, Biezup & Henderson, Philadelphia, PA, of counsel), for defendant.

## OPINION

SUE L. ROBINSON, District Judge.

## I. INTRODUCTION

Plaintiff Ralph E. Smith, Jr. initiated this litigation on June 8, 1992 against defendant Delaware Bay Launch Service, his former employer. (D.I.1) He sought maintenance and cure, damages for unreasonable failure to pay maintenance and cure, and damages for unseaworthiness and negligence under the Jones Act, 46 U.S.C.App. § 688, in relation to three shipboard accidents occurring in December 1989, December 1990, and January 1991. After a trial, the jury found for defendant on the negligence and unseaworthiness claims, but awarded plaintiff $50,905 for maintenance and cure. The jury also awarded plaintiff $300,000 in compensatory damages for defendant's unreasonable failure to provide maintenance and cure. (D.I.45) The district court then granted judgment as a matter of law to defendant on the unreasonable failure to pay maintenance and cure claim and granted a new trial on the amount of maintenance and cure due.[1] *Smith v. Delaware Bay Launch* Serv., 842 F.Supp. 770 (D.Del.1994), *aff'd*, 54 F.3d 770 (3d Cir. 1995). The Third Circuit affirmed the jury's findings on the negligence and unseaworthiness issues, upheld the district court's grant

of judgment as a matter of law, and dismissed as unappealable the grant of a new trial. *Smith v. Delaware Bay Launch Service*, 77 F.3d 464 (3d Cir.1996).

A bench trial on the sole issue of the amount of maintenance and cure due to plaintiff was held in December 1996. Here follow the court's findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52(a).[2]

## II. FINDINGS OF FACT

1. Plaintiff worked as an employee of defendant for approximately four years. During the majority of his employment with defendant, plaintiff served as a deckhand for defendant's water taxi service. His duties included loading and unloading supplies, running a crane and forklift, assisting with the loading and unloading of passengers, and general housekeeping. (Tr. A179–80)[3] Plaintiff testified that before his employment with defendant, he had several other, predominantly physically active jobs, such as building houses, driving a truck, changing light bulbs on radio towers, bridge construction, and net fishing. (Tr. A164, A168, A172, A173) Plaintiff also described a physically active lifestyle before his injuries, including fishing, deer and duck hunting, scuba diving, and lobstering. (Tr. A160–63)

2. In 1973, before he was employed by defendant, plaintiff fell off the roof of a house he was helping to build, injuring his lower back. The injury rendered him unable to work for approximately three weeks, after which he returned to his normal level of activity. (Tr. A170–71, C20 ) He also sustained a pull or strain in his lower back in 1986, while working as a net fisherman. (PX 38x) Plaintiff testified that he returned to work three days after that injury. (Tr. A174) Dr. Eleanor Stump, a chiropractor who has treated plaintiff on and off since

---

1. The court let stand the portion of the jury's verdict finding that defendant was obligated to pay maintenance and cure. *Smith v. Delaware Bay Launch Serv.*, 842 F.Supp. at 778.

2. The court notes that once again, in contravention of this court's order March 26, 1997 (D.I. 166) and numerous earlier rulings, plaintiff has wandered far beyond the scope of issues to be determined in this proceeding and has argued matters long since settled. To avoid further delay and confusion, the court will not require plaintiff to resubmit his brief, but will address only the issues properly before it.

3. References to the transcript of the previous trial will be referred to by docket item number.

1983, testified that plaintiff had complained of lower back pain and neck soreness on occasion, but that he was generally in good health throughout the 1980s. (Tr. B7–8, PX 38x) His visits were sporadic, and he reported no numbness or acute neck or arm pain. (Tr. B8)

3. While employed by defendant, plaintiff was injured in three separate shipboard accidents, occurring on or about December 23, 1989, December 13, 1990, and January 11, 1991, aboard defendant's vessel, *Big Stone.* In the first incident, the boat hit a wave, throwing plaintiff forward and then back and hitting the base of his skull against metal pipes running along the back of his seat. (Tr. A183) The second accident, a year later, involved stormy conditions and high swells. The boat slammed into a wave, throwing plaintiff to the floor. Plaintiffs head, left shoulder, and ribs hit the base of the captain's seat. (Tr. A197) About a month after the second incident, the boat went out in high winds and storm conditions. (Tr.A201) Again plaintiff was thrown from his seat and landed on the floor with his leg under him. His head and left shoulder struck the radar unit and the bulkhead. (Tr. A203–04) Plaintiff left his employment shortly thereafter. (Tr. A214)

4. After the first accident on the Big Stone, plaintiff sought medical treatment, presumably with his family physician.[4] (Tr. A185) He also complained of neck pain and numbness in his fingers to Dr. Stump. (Tr. B16) Several months after the first accident, during the summer of 1990, plaintiff was working with a large wrench in the boat's engine room when he began to experience spasms in his neck and arms and stomach cramps. (Tr. A193) Due to plaintiff's recent exposure to ticks while clearing a marshy area for a marina, his physician, Dr. Wagner, suspected Lyme disease. (Tr. A194, PX 51) Plaintiff was ordered to stay home from work for approximately six weeks. The tests for Lyme disease were negative, but according to plaintiff, he was warned that he might

have sustained damage to his ulnar nerve. (Tr. A194, PX 51) Plaintiff continued to see Dr. Stump as well as take pain medication. In addition, Dr. Sutton, an osteopath at Dickinson Medical Group in Milford, Delaware, prescribed a home traction unit to relieve some of the pain. (Tr. A207, PX 35) By the end of April 1990, plaintiff reported feeling much better, with the numbness in his hand gone. (PX 38b)

After the second accident, plaintiff sought treatment with Dr. Sutton, who performed therapeutic massage and prescribed medication to decrease pain and inflammation. (Tr. A199, PX 35) Plaintiff testified that he returned to work after this accident. (Tr. A199)

5. Three days after the third accident, plaintiff returned to Dr. Stump's office complaining of neck, back, and shoulder pain. His right hand was numb and cold. (PX 38b) After that, plaintiff increased the frequency of his visits to Dr. Stump to three times per week.

Dr. Stump's testimony and treatment notes paint a picture of considerable, if not quite steady, deterioration of plaintiff's physical condition over the ensuing six years. In February 1991, just one month after the third accident, plaintiff reported feeling better and was able to do some painting over the weekend. (PX 38b) By late April and early May of that year, plaintiff reported some improvement, and Dr. Stump recorded that while plaintiff's extension range was still limited, his lateral and flexion ranges were both "good." (PX 38b) Physical exertion, however, even at a relatively low level, took its toll. Dr. Stump reported that such activities as yard work, operating an electric drill, extended periods of standing, or tossing an orange aggravated plaintiff's symptoms[5] (Tr. B40, B48; PX 38b) Since 1991 and continuing through the end of 1996, Dr. Stump's treatment records indicate that plaintiff reported fairly constant and frequently acute neck pain, with recurrent back spasms and tin-

4. There does not appear to be any documentation of a doctor's office visit during this period.

5. Dr. Stump also admitted on cross examination that plaintiff had been thrown to the floor during

a fight in June 1994, further exacerbating his symptoms. (PX 38b; Tr. B60) Plaintiff confirmed that this incident had occurred. (Tr. B111–13)

gling and numbness in his fingers. (PX 38b) In conjunction with the chiropractic treatments, plaintiff received therapeutic massage from Barbara Lake, who at one time worked for Dr. Stump and then went out on her own. Ms. Lake has treated plaintiff since 1992, (Tr. A54)

6. During the period following the third accident, plaintiff also visited his family physician, Dr. Charles Wagner. (Tr. B113) On March 15, 1991, Dr. Wagner submitted a letter to plaintiff's previous attorney, stating that he had examined plaintiff numerous times, most recently on March 14, 1991. Based on physical examinations, plaintiff's symptoms, and x-ray findings, Dr. Wagner concluded that plaintiff

> does have multiple complaints and that he has been urged to maintain a posture of exercise and stamina building which hopefully will return him to his previous pain free self. He has no focal neurological deficit which makes it difficult to pinpoint the exact injury which he is claiming refers back to his job injury.
>
> . . . .
>
> This patient has multiple level paraspinal muscle spasms and peripheral neurothesias from degenerative arthritis involving the spine at multiple levels which he feels are exacerbated by work conditions and incidents at work in the year 1990–1991.

(PX 51)

7. Near the end of 1991, at the suggestion of plaintiff's attorney, Dr. Stump referred plaintiff to Dr. Pierre LeRoy at the Delaware Pain Clinic in Newark, Delaware. (Tr. B91–92; PX 38b) Plaintiff visited Dr. LeRoy in February 1992, complaining of pain, ranging in intensity from moderate to severe, in his neck and radiating down his right arm to his fingers. He also complained of pain and swelling in his shoulder and arm joints, numbness in his right hand, and blurred vision. (Tr. C20; Ct. Ex. 1) Upon initial evaluation and MRIs, Dr. LeRoy did not find any definite disc herniation, but did find localized muscle inflammation and lower back strain. (Ct. Ex. 1) He also found abnormalities in plaintiff's thoracic outlet, defined by Dr. LeRoy as "the area in which the large nerves and muscles come out and blood ves-

sels into the upper extremities." (Tr. C24) Dr. LeRoy prescribed anti-inflammatory drugs, local heat, physical therapy, and restrictions on plaintiff's activities. (Tr. C36; Ct. Ex. 1) On subsequent visits, Dr. LeRoy prescribed stronger drugs, such as Percodan, Valium, Dantrium, and methadone, due to plaintiff's persistent complaints of pain and spasms. (Tr. C41–42; Ct. Ex. 1; PX 55a) He also performed local nerve blocks and referred plaintiff for physical therapy, continuing chiropractic adjustments, acupuncture, and vocational rehabilitation. (Ct. Ex. 1)

By May 1993, Dr. LeRoy's treatment notes indicate that plaintiff was complaining of pain and numbness in both arms as well as his neck and lower back. He had by that time diminished his daily activity level, and had tried several medications for pain, all of which either proved ineffective or had intolerable side effects. (Ct. Ex. 1) By July of the same year, plaintiff reported pain in his right leg; by the fall of 1995, the pain and numbness extended to both legs. (Ct. Ex. 1) The last entry in Dr. LeRoy's treatment records, dated October 28, 1996, differs little from the previous entries. It records plaintiff's complaints of near-constant pain and spasms, recites a litany of ineffective or partially effective medications and other treatments, and lists an ever-narrowing range of physical activities which plaintiff felt able to perform. (Ct. Ex. 1)

8. Dr. LeRoy's treatments, as evidenced by his testimony, the pharmacy bills, and treatment records, as well as by the mission of the Delaware Pain Clinic itself, focused on the management of chronic pain. (PX 55a; Tr. C85–88)

9. In October 1992, plaintiff sought an evaluation from Dr. Alan J. Fink at Neurology Associates, P.A., in Wilmington, Delaware. (Tr. C149) Dr. Fink reported on his examination of plaintiff on October 20, 1992. The orthopedic portion of the examination showed a normal range of motion in plaintiff's neck, back, and legs. The neurological exam showed no abnormalities, no atrophy, and a motor strength rated at 5 (full strength). An MRI revealed a spur on the

disc between plaintiff's 6th and 7th vertebrae. In his assessment, Dr. Fink expressed the opinion that plaintiff suffered from "a combination of soft tissue injury to the neck and right shoulder which has resulted in his pain, as well as numbness secondary to compression of the C7 nerve root by a C6–C7 spur." (DX 2a) Dr. Fink also noted that plaintiff had received a diagnosis of "spurs or arthritis of the neck" from Dr. Wagner after plaintiff began experiencing symptoms following his first accident. Dr. Fink offered three options for improving plaintiff's condition: 1) exercise and medication to reduce the soft tissue pain; 2) "a trial of physical therapy ... to see if cervical traction and trigger point injections would be helpful to him;" or 3) the more aggressive option of myelography to ascertain whether the C6–C7 disc was herniated. Surgery on the herniated disc, if one were found, would likely relieve the numbness but not the pain in plaintiff's neck. (DX 2a)

On August 25, 1993, Dr. Fink submitted a report from another examination of plaintiff. As before, the orthopedic exam showed a normal range of motion and the neurological tests showed no abnormalities. Plaintiff's strength had also not deteriorated. After reviewing MRIs, Dr. Fink reported that

> Mr. Smith's condition has not significantly changed since I last saw him in October 1992. It has been my feeling that a trial of therapy with a physiatrist would be beneficial. If this were unsuccessful, then the only way ... to [determine] whether or not surgery is likely would be a myelogram and post-myelogram CAT scan.

(DX 2b)

10. The record demonstrates that the treatment plaintiff has received from Dr. LeRoy, Dr. Stump, and Barbara Lake has varied little over the past six years. Dr. LeRoy's treatment notes reveal that the basic treatment strategy—local heat, chiropractic adjustments, nerve blocks, and a variety of pain medications—has not changed since plaintiff began seeing Dr. LeRoy. (Ct. Ex. 1)

11. The testimony of Dr. Stump, Barbara Lake, Dr. LeRoy, as well as that of plaintiff himself, indicate that the treatment plaintiff currently receives is predominantly palliative in character. (Tr. A75, B79–80 ) Dr. Stump testified that plaintiff showed improvement when he was receiving chiropractic care three times a week, and that his symptoms became more severe when he reduced the number of weekly treatments he received. (Tr. B32, B39) She offered no opinion, however, on whether the underlying problems she perceived were healing, i.e., whether her treatments were bringing plaintiff closer to a cure or simply alleviating his symptoms. Dr. Stump did acknowledge the limitations of chiropractic care, both in general and as applied to plaintiff:

> Overall, every area of treatment has its limitations. And he can get just so much better considering the structural damage that he has in his spine ..... With as many visits, it's been 383 now, if he were to get better, he would have gotten better.... On his x-ray, MRI report, he has bulging disk, he has herniated disk. Chiropractic can only do so much with that type of condition.

(Tr. B41–42) In addition to Dr. Stump's testimony, plaintiff himself testified that the chiropractic treatments offered relief from pain for, at most, a few hours. (Tr. B104) Although as of March 1991 Dr. Stump expected plaintiff to need only six to nine months of treatment, his symptoms have deteriorated, rather than improving, since then. (Tr. B73)

12. At trial, plaintiff presented medical evidence attempting to show that his continuing pain and numbness result from the three incidents in which he struck the floor or other hard objects on the *Big Stone* while the boat traversed rough water. According to plaintiff's treating physician, Dr. LeRoy, plaintiff's injuries on board defendant's vessel resulted in "abnormalities" to plaintiff's spine, including a disk herniation. (Tr. C52) Interpreting MRI films taken in October 1990, between plaintiff's first and second shipboard accidents, Dr. LeRoy testified that plaintiff had "a preexisting osteoarthritis of the spine" which, prior to plaintiff's 1989 accident, had been asymptomatic. (Tr. C33) He also found evidence of a "structural abnormality" in plaintiff's C6–C7 disk, which he testified is consistent with plaintiff's symp-

toms of pain and numbness in the third, fourth, and fifth fingers. (Tr. C35) Because the abnormality appeared to be localized, Dr. LeRoy diagnosed the problem as trauma-related. (Tr. C36) In November 1996, Dr. LeRoy ordered another set of MRIs. They showed, according to Dr. LeRoy, a "large area of indentation" in the covering of the spinal nerves, intruding into the spinal canal. (Tr. C46) Dr. LeRoy testified that the images showed plaintiff's condition had worsened. He expressed a concern that the intrusion of the indentation into an area called the "thecal sac" could result in paralysis. (Tr. C67)

In October 1993, during the first trial in this case, Dr. LeRoy stated that he had discussed the possibility of surgery with plaintiff but that plaintiff had declined due to the risks associated with back surgery. (D.I. 49 at 199) Dr. LeRoy's treatment notes, dated May 1, 1992, corroborate this statement. (Ct. Ex. 1) Dr. LeRoy did testify in 1993, however, that plaintiff was reconsidering his decision not to undergo surgery. (D.I. 49 at 201) As of the date of the second trial, plaintiff had not yet done so.[6]

13. Dr. Stump testified that plaintiff's spinal cord, which was basically in alignment in 1983, has become severely misaligned with his skull and vertebrae, a condition that has worsened over time. (Tr. B15, B27) Interpreting x-rays taken since the accidents, Dr. Stump stated that plaintiff's cervical spine has lost its normal curvature, placing pressure on the nerves that extend to the fingers and causing numbness, tingling, and pain. (Tr. B18–20, B37–38, B43)

14. Defendant's expert witnesses, on the other hand, presented convincing testimony that traumatic injuries are not the cause of plaintiff's persistent symptoms. Dr. Bruce Heppenstall, an orthopedic surgeon who offered expert testimony on behalf of defendant, testified that he had reviewed plaintiff's medical records, x-rays, MRIs, and the results of his own examination of plaintiff. Dr. Heppenstall expressed his medical opinion

that plaintiff had suffered a strain to both the cervical and lumbar areas of his spine, and also suffered from "underlying osteoarthritis of the cervical spine." (DX 7a) Such an injury, Dr. Heppenstall testified, usually "resolves" in eight to ten weeks with conservative treatment. (DX 13a at 26–27) After eight to ten weeks, according to Dr. Heppenstall, a patient with this type of back strain is normally able to return to work. Dr. Katz, defendant's neurological expert, agreed, stating that soft tissue injuries and lumbosacral sprains normally resolve in a few weeks to a few months. (DX15a at 25) Both Dr. Heppenstall and Dr. Katz stated that plaintiff showed no neurological abnormalities and that his range of motion was normal. (DX13a at 19–21; DX15a at 17–22) There was no evidence of disc herniation or other indicator that plaintiff still suffered the effects of a traumatic injury. (DX15a at 23) It is notable that Dr. Heppenstall and Dr. Katz, when asked about the length of time a traumatic injury would cause pain or other symptoms, spoke in terms of healing rather than of permanent disability. No medical expert expressed the opinion that the traumatic injuries plaintiff suffered were likely to leave him permanently disabled and in pain.

15. It is clear, from the testimony of numerous witnesses as well as the court's observation of plaintiff, that plaintiff, more than six years after his last shipboard accident, continues to suffer. Barbara Lake, plaintiff's massage therapist, testified that plaintiff's condition has worsened since she began treating him in 1992. (Tr. A54) Ms. Lake testified that during the massage therapy treatments, plaintiff experienced spasms in various parts of his body and appeared to be in great pain. (Tr. A55, A59) She also reported that plaintiff often stumbles and cannot grasp small objects with his hands. (Tr. A58)

Paula Cline, plaintiff's companion, testified that plaintiff walks "slumped over" and cannot move quickly. (Tr. A87) She also stated that plaintiff has difficulty sleeping, cannot

---

6. During the second trial, plaintiff proffered testimony that Dr. LeRoy had more recently made a specific recommendation that plaintiff undergo a surgical intervention. The court excluded this testimony due to plaintiff's failure to provide defendant with an updated expert report or any other indication that Dr. LeRoy's testimony would differ significantly from the opinions he gave at the first trial. (Tr. C48–51, C57–62)

perform even mildly physical tasks, and is "in constant pain. He has constant headaches. . . . A lot of times he can't walk." (Tr. A88)

Plaintiff himself testified that his condition has gotten steadily worse, that his daily activities are extremely limited, and that he can rarely get comfortable. (Tr. B162, A167–68) He has difficulty lacing his shoes and cannot sleep in a regular bed. (Tr. A167) He is angry and depressed, and suffers great embarrassment from the frequent rectal bleeding which he claims is a side effect of his pain medications. (Tr. B162–64)

16. The answer to this conundrum lies in the testimony of Dr. Heppenstall:

> I feel that he may have those symptoms [ie, neck and arm pain and numbness], and that they're most likely, to a reasonable degree of medical certainty, due to degenerative arthritis of the cervical spine. . . . He did not get rid of the arthritis, he still has arthritis.

(DX 13a at 33–34) Dr. Heppenstall testified that x-rays taken in 1990 revealed bone spurs and other indications of degenerative arthritis. He concluded, based on those films, that plaintiff "obviously had some arthritis in his cervical and lumbar spine which predated his accident." (DX 13a at 22, 26) On cross examination, Dr. Heppenstall admitted that an injury of the type suffered by plaintiff could exacerbate a degenerative arthritis condition. (DX 13a at 36) A traumatic injury could also hasten or exacerbate the development of bony spurs such as those Dr. Heppenstall observed on plaintiff's MRIs. (DX 13a at 47)

Dr. George Teplick, a radiologist who testified for defendant, confirmed Dr. Heppenstall's analysis. He stated that while he found no evidence of "post-traumatic herniations or of any other post-traumatic changes in the cervical spine" in plaintiff's x-rays or MRI images, he did find degenerative disk disease at several positions along plaintiff's cervical spine. (DX 14a at 16–17) He further testified that degenerative disk disease could produce symptoms such as radiculopathy (pain radiating to the extremities), in cases where the bony spurs press on a nerve. (DX 14a at 28) Similarly, Dr. Katz, a neurologist

who testified for the defense, stated that while he saw no indication of neurological damage resulting from trauma, he also noticed the bone spurs mentioned by the other two defense experts. (DX 15a at 23)

In fact, every one of the qualified medical experts who testified, including plaintiff's witnesses, reached the finding that plaintiff had a pre-existing degenerative arthritic condition characterized by the bony spurs on his cervical spine. Dr. Stump's treatment notes include a diagnosis of degenerative arthritis, which plaintiff reported he received from his physician, Dr. Wagner. (Tr. .B71; PX 38b) Dr. Fink's report also mentions this previous diagnosis, with which he concurred. (DX 2a) Dr. LeRoy, as well, acknowledged that plaintiff suffered from osteoarthritis, the symptoms of which, he pointed out, did not emerge until after 1989. (Tr. C33, C72)

17. Although both Dr. Heppenstall and Dr. Teplick testified that nearly everyone experiences degenerative disk disease sooner or later, both Dr. Heppenstall and Dr. Teplick acknowledged that it is frequently asymptomatic, and Dr. Heppenstall testified that individuals who performed heavy labor were more likely to experience the disease earlier in life. (DX 13a at 23–24; DX 14a at 25–26) As noted above, plaintiff performed heavy labor and engaged in strenuous recreational activities until his symptoms prevented him from doing so.

18. Based on the uncontroverted testimony of the medical experts in this case, the court concludes that plaintiff had asymptomatic degenerative arthritis before the date of his injuries. The court further finds that the arthritis began to manifest symptoms sometime after plaintiff's December 1989 accident, while he was still in the employ of defendant, and continues to plague him to the present time.

19. Although defendant's experts all expressed the opinion that no further curative treatment was necessary or possible for plaintiff's traumatic injuries, no expert or treating physician testified (or was asked) whether plaintiff's arthritic condition was

treatable.[7] Neither party has offered any evidence as to whether any physician or other medical care provider who has worked with or examined plaintiff has offered an opinion on whether degenerative arthritis can be cured or improved through treatment. No competent medical authority has declared plaintiff's condition permanent.

20. Plaintiff offered evidence of numerous expenses incurred by himself, family members, and friends and related to his claim for maintenance.

### a. Food

Plaintiff's mother, a 72–year–old homemaker who lives on a small income, provided plaintiff with groceries as well as homegrown canned and frozen vegetables from her garden, at a cost estimated by plaintiff at around $8,000 over a seven year period. (PX 34) Mrs. Smith testified that her husband, Ralph Smith Sr., had come out of retirement and took a job driving a truck in order to support their son. In addition, she stated that her savings had been exhausted and that she and her husband had to sell their vacation home in Florida due to the financial strains caused by plaintiff's injuries. (PX 34 at 20–24) However, when asked during her deposition whether she ever expected to be repaid for the food and other items she had purchased for plaintiff, she replied that she had no such expectation. (PX 34 at 73) Moreover, Mrs. Smith testified that she had not kept accounts of the money she had spent on food

and other items for her son, an indication that she did not, in fact, expect repayment.

Similarly, Martha Watts, a family friend of plaintiff's, testified that she had provided plaintiff and his former girlfriend with groceries on about eight occasions and fed them meals approximately eighty times. (PX 85 at 17–19) On cross examination, Ms. Watts was asked whether she expected to be paid back for the food and money she had provided. She replied, "I told Ralph and Darlene, when they got on their feet, that they could make it up to me." (PX 85 at 30)

Paula Cline testified that she also bought groceries for plaintiff and occasionally took him out to dinner. (Tr. A109, A125) She estimated that, since she has known plaintiff, she has spent $20,000 to provide plaintiff with food, clothing, medications, animal feed, and the like, and that approximately half of that sum was spent on restaurant meals and other events and items "to help his mood." (Tr. A113, A125) Ms. Cline estimated that she spends $120 per month on groceries for herself. (Tr. A149050) She also acknowledged that she often eats meals with plaintiff, either at his home or in restaurants. (Tr. A147) Plaintiff has submitted grocery receipts for food items paid for by Ms. Cline. He acknowledges that the receipts are somewhat inaccurate, due to many having been lost and to the inclusion of nonfood items. (PX 65a) Ms. Cline testified that she had not kept receipts for all of the food she provided to plaintiff, and that she did not know exactly how much she had spent. (Tr. A149)

---

7. One possible exception is a series of somewhat cryptic questions from plaintiff's counsel apparently designed to elicit a response from Dr. Heppenstall that plaintiff's condition is permanent:

> Q. You testified that you believe that Mr. Smith did, in fact, have degenerative arthritis, would you be willing to, at this point in time, or do you have sufficient information in your records, to assess the degree of permanent impairment to his neck or upper-spinal region as a result of the arthritic condition that you observed?
> A. The arthritis alone you mean without the injury, or do you mean the injury itself?
> Q. Well, let's—let's take them both in—in sequence. How about the—the—would you assess any permanent impairment to his neck and upper back as a result of the injury you diagnosed on—that occurred in December of 1989?

> A. I have already answered that on the record. I said no.
> Q. Okay. And as a result of the degenerative arthritis?
> A. The answer is no. He would not have any significant problems related to what the patient is complaining about as a result of not having any particular injury or significant problem with his—with his spine.

(DX13a at 47–48) In addition, Dr. Teplick testified that he could observe no change in the condition of plaintiff's spine between images taken in 1990 and those from 1992. (DX14a at 37) The court is unable to decipher from this testimony any medical opinion on the part of Dr. Heppenstall or Dr. Teplick either that plaintiff's condition is permanent or that curative treatment is available.

In their post trial briefs, both parties have attempted to estimate the total amount Ms. Cline spent on plaintiff's food. Plaintiff started with Ms. Cline's estimate of $10,000 spent on groceries and restaurant meals and reduced it by 25% to account for the portion she consumed to arrive at a daily average of $7.81. (D.I. 167 at 33–34) Defendant, on the other hand, utilized the receipts submitted as Exhibit 65a and calculated a monthly percentage of nonfood items. Taking into account the food provided by plaintiff's mother and the food consumed by other members of plaintiff's household, defendant estimated a total daily average food expense of between $2.80 and $4.00 for plaintiff. (D.I. 147 at 12–15) Subtracting the contribution of Ethel Smith, estimated by defendant at $1.50 to 1.71 per day, Ms. Cline's average daily contribution to plaintiffs food was between $1.09 and $2.50. Although the court finds defendant's figures better supported by the evidence, the court also accepts plaintiff's contention that not all food expenditures are accounted for in the receipts. Therefore, the court accepts the $2.50 per day figure as more accurately representing the amount Paula Cline contributed to plaintiff's food expense.

In contrast to other friends and family members who had provided money or food to plaintiff, Ms. Cline stated explicitly that she "would like to be reimbursed," and that she had discussed repayment with plaintiff. (Tr. A156–57) Somewhat contradictorily, however, she admitted that she had provided for plaintiff, in defense counsel's words, "out of the kindness of [her] heart." (Tr. A157)

According to plaintiff, Darlene Sharp, plaintiff's former companion, paid for the groceries represented by the receipts admitted as Exhibit 65c. (Tr. B137–38) Ms. Sharp did not testify at the December trial, and there is no testimony of record, in either the first or second trial, indicating a promise or obligation on plaintiff's part to repay her.

Plaintiff did not testify that he had bought any of his own food in the past six years. At no point during his testimony did plaintiff state that he had made a promise and assumed an obligation to repay any of the individuals who had provided him food. On the basis of the testimony from plaintiff and the individuals who helped support him, the court concludes that plaintiff did not provide any of his own food. In addition, the court finds that plaintiff did not assume an obligation to repay the individuals who provided food for him, with the exception of Paula Cline.

### b. Lodging

Plaintiff has submitted electric bills averaging $96.57 per month. (PX 58) At least some of these bills were paid by plaintiff's father. (PX 33) Ralph Smith Sr. also paid plaintiff's property taxes, estimated by plaintiff to be $300 per year. (Tr. B144) The property tax statements introduced by plaintiff as Exhibit 60 are somewhat confusing. According to defendant, they account for more than one property, a contention that is undisputed by plaintiff. However, neither party has provided any assistance to the court in sorting out which taxes apply to the property in which plaintiff lived. Plaintiff submitted bills for heating oil from 1993, 1994, and 1995. (PX 61) He estimated that he uses an average of 375 gallons per year, at an average cost of $.95 per gallon. At least $100 of plaintiff's heating expenses was paid by Martha Watts, to whom plaintiff has incurred no obligation of repayment. (PX 85 at 25; Tr. C160) Plaintiff's annual premium for homeowner's insurance, $191, is paid by his father. (PX 63; Tr. B147–48; PX 33)

### c. Other Items Claimed as Maintenance

In addition to items directly pertaining to plaintiff's food and lodging, plaintiff has claimed various amounts for telephone bills, animal feed, toiletries, clothing, installation of a septic system and a well on his property, moving expenses, major appliances, construction materials, paving materials, and rat bait. He claims a total of $14,610.16 for these and similar miscellaneous expenses.

21. During trial, plaintiff presented the following evidence of his medical expenses:

### a. Massage Therapy

Plaintiff has received treatments from Barbara Lake, a massage therapist, between one

and three times per week over the past four and a half years. (Tr. A53) She has charged him a discounted rate of $30/hour for her services and has not charged him for her time or mileage in traveling to his home. (Tr. A66–A68) Plaintiff has submitted a bill from Ms. Lake totaling $250 for massage treatments received in 1996. The bill also denotes the $175 discounted from her normal rate. (PX 47) Ms. Lake has not billed plaintiff for this additional $175, nor did she testify that she expects to receive it. In addition to the treatments indicated on the bill, Ms. Lake testified to three additional treatments rendered after the bill was submitted, for a total of $90. (Tr. A66) According to Ms. Lake, plaintiff has paid her $350. (Tr. A67)

### b. Chiropractor

Plaintiff has received chiropractic treatments from Dr. Eleanor Stump between one and three times a week since his symptoms began to manifest themselves, for a total of 383 visits since 1989. (Tr. B34) Dr. Stump testified that plaintiff's bills total $16,355,50, all but $559 of which has been paid by plaintiff's father. (Tr. B34–35) In his brief, plaintiff claims a total of $16,385.50. (D.I. 167 at 37) The bills themselves, admitted during trial as Exhibits 37 and 84, show a balance owing of $602 and paid bills of $15,786.50, for a total of $16,388.50.

### c. Dickinson Medical Group

At trial, plaintiff introduced an invoice from Dickinson Medical Group in the amount of $359.80 for treatment received from Drs. Harris and Sutton between November 1990 and January 1991.[8] (PX 35) Plaintiff testified at trial that this invoice has not been paid. (Tr. A208) Defendant has submitted "Explanation of Benefits" forms from Blue Cross/Blue Shield showing that charges from 1990 and 1991 were covered under the plan. (DX 29) It appears that the bill from Dickinson Medical Group takes these payments into account. The balance owing, therefore, is $359.80.

### d. Dr. LeRoy

Plaintiff introduced into evidence the billing statement from Dr. LeRoy at the Delaware Pain Clinic covering the past five years. The invoice shows a total amount due of $16,875. (PX 43) According to Dr. LeRoy, plaintiff has not paid any of this amount. (Tr. C66) Although Dr. LeRoy stated that he continued to treat plaintiff despite the large, unpaid balance due to humanitarian concerns, the pain clinic has continued to bill plaintiff. (Tr. C66)

### e. Other Bills for Medical Treatment

In addition to the above-mentioned claims, plaintiff submitted bills from the Christiana Imaging Center for MRIs performed in 1992 and 1996. The bills show $2,295 outstanding for the 1996 MRIs and $333 for the 1992 films. (PX 44) Plaintiff also entered into evidence a bill for $428 from Milford Memorial Hospital, which plaintiff testified referred to a barium enema necessitated by the side-effects of his medications. (PX 52; Tr. B115–16) Plaintiff was referred to Milford Memorial by his family physician, Dr. Wagner, whose bill for a total of $125 is also included in Exhibit 52. (Tr. B116–17) The same exhibit contains a past due notice from Milford Radiology Associates indicating a balance of $151.

### f. Medical Supplies and Prescriptions

Plaintiff has submitted pharmacy receipts totaling $2,180.68 for medications prescribed by Dr. LeRoy. (PX 55a) Of this amount, $436.86 appears to have been covered by insurance, for a total outlay by plaintiff of $1,743.82. (PX 55a; Tr. C154)

Both plaintiff and Paula Cline testified that plaintiff uses a whirlpool massage spa to ease the pain in his back and neck. (Tr. A101, B153) Although plaintiff has made no attempt in his post trial brief to direct the court's attention to testimony concerning the whirlpool's medical necessity, the court did discover a letter from Dr. Stump attached to

---

8. In his post trial brief, plaintiff claimed a total of $454.80 for cure received from the Dickinson Medical Group. This amount includes $95 listed on the invoice as "Insurance Pending." The bill does not indicate that plaintiff is responsible for the $95, but rather lists the "Personal Amount Due" as $359.80.

a pile of receipts in which she recommends the use of a whirlpool at home. (PX 46) According to the letter, dated November 11, 1991, the whirlpool "is a form of corrective treatment for [plaintiff's] cervicobrachial syndrome and C1–2 malposition." (PX 46) There is no evidence of record as to whether a whirlpool is indicated as treatment for arthritis.

Plaintiff has submitted numerous receipts in connection with the whirlpool. In addition to the $3,995 for the whirlpool itself, plaintiff has included $274.19 in receipts for supplies at least arguably connected to the maintenance and repair of the spa. Numerous other receipts, however, bear no obvious relation to any therapeutic use of the whirlpool. They include unlabeled receipts, receipts for clothing such as robes and what appear to be either slippers or sunglasses, and one invoice in the name of Bruno Chalabala, who, as far as the record indicates, has no connection to this case. (PX 46) Plaintiff also included in his brief a claim for $400 for a spa cover, also referencing Exhibit 46. The court can locate no corresponding receipt for this claimed expense.

Both plaintiff and Dr. Stump testified that Dr. Sutton prescribed a home traction unit to ease plaintiff's pain between appointments. (Tr. A207, B132) Plaintiff has submitted a copy of instructions for use from a home traction unit, but no receipt. (PX 55b) During his testimony, plaintiff could not recall the exact amount paid for the unit, but estimated its cost at approximately $20. (Tr. B133) Plaintiff also submitted a receipt for liquid insoles in the amount of $20. (PX 55b) At trial, plaintiff testified that Paula Cline had purchased several pairs of insoles for him, at a total estimated cost of $70. (Tr. B135) Plaintiff's testimony is somewhat ambiguous as to whether a doctor or other health care provider recommended their use:

Q. Did any of your doctors recommend you use [liquid insoles]?

A. Yes. Matter of fact, once they found out I was using them, thought they was real good. As a matter of fact, Dr. Stump commented as to how good she thought they may be and she may even start keeping them at her place.

(Tr. B134) This testimony, combined with the absence of any mention of the insoles in the records provided to the court, indicates that the use of the insoles was not specifically recommended or prescribed by a doctor.

### g. Dental and Eye Care

Among the doctor bills and other receipts pertaining to plaintiff's neck and back problems, he has included dentist, periodontist, and ophthalmologist bills and medical records from 1995 and 1996. (PX 49, 53, 54, 56) Plaintiff claims $77 in dental bills, $72 for eye care, and $219 for eyeglasses purchased in 1994.

### h. Automobile expenses

Plaintiff claims automotive expenses in the amount of $7,654.80. In addition, he estimates a total of $9,519.23 in mileage related to obtaining medical care, at $.29 per mile. In support of his claim, plaintiff has offered into evidence an insurance premium bill for $169 and numerous bills and receipts for parts and service.

22. By check dated December 30, 1991, defendant paid plaintiff $2,054. (DX 24) The check was marked "Maintenance & cure 1/11/91 thru 3/25/91."

## II. CONCLUSIONS OF LAW

1. A shipowner must pay maintenance (food and lodging) and cure (medical expenses) for any seaman who is injured or falls ill while in the service of the ship. *Barnes v. Andover Co.*, 900 F.2d 630, 633 (3d Cir.1990). This obligation, which has been recognized for centuries, "derives from the 'unique hazards (which) attend the work of seamen' and fosters the 'combined object of encouraging marine commerce and assuring the well-being of seamen.'" *Vella v. Ford Motor Co.*, 421 U.S. 1, 3–4, 95 S.Ct. 1381, 1383, 43 L.Ed.2d 682 (1975) (quoting *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 727, 63 S.Ct. 930, 932, 87 L.Ed. 1107 (1943)). Because seamen are considered wards of the court, the duty to provide maintenance and cure must be construed liberally. *Vaughan v. Atkinson*, 369 U.S. 527, 531–32, 82 S.Ct. 997, 999–1001, 8 L.Ed.2d 88 (1962).

2. Maintenance and cure may be withheld only in cases of "wilful misconduct on the part of the seaman." *Barnes v. Andover,* 900 F.2d at 633. No wilful misconduct on the part of plaintiff has been alleged in this case.

▇▇▇ 3. An injured seaman, even one who is permanently disabled, is not entitled to maintenance for the rest of his life. Rather, the shipowner's obligation continues until such time as the seaman reaches "maximum cure," that is, when the seaman has recovered or when it is determined that medical treatments will no longer improve his condition. *Farrell v. United States,* 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949); *Barnes v. Andover,* 900 F.2d at 634. A shipowner's duty to provide maintenance and cure extends not only until such time as the injured seaman's condition becomes permanent, but until it has been declared permanent by competent medical authority. *Vella v. Ford Motor Co.,* 421 U.S. at 4, 95 S.Ct. at 1383. To hold otherwise, the Court reasoned, would "stir contentions, cause delays, and invite litigations." *Id.* at 4, 95 S.Ct. at 1383.

▇▇▇ 4. Although the injured seaman bears the burden of establishing that he is eligible for maintenance and cure, the shipowner has the burden of proving that maximum cure has been reached. *McMillan v. Tug Jane A. Bouchard,* 885 F.Supp. 452, 459 (E.D.N.Y.1995).

▇▇▇ 5. A finding that an injured seaman has reached maximum cure due to the permanency of his condition does not preclude him from seeking further maintenance and cure from the shipowner if a new treatment, such as a newly developed drug or surgical technique, becomes available. *Cox v. Dravo Corp.,* 517 F.2d 620, 626 (3d Cir.1975) (citing *Farrell v. United States,* 336 U.S. 511, 519, 69 S.Ct. 707, 711, 93 L.Ed. 850 (1949)).

6. The Third Circuit has recognized that the determination of when a seaman has reached maximum cure is not always clear-cut:

We can imagine a factual dispute as to when a diagnosis of permanency was made. If there is such a dispute it must be resolved by the trier of fact. When it is so resolved the date of diagnosis so determined, and not the date of the judicial determination, defines the end of the vessel's maintenance and cure obligation.

*Cox v. Dravo Corp.,* 517 F.2d at 627.

▇▇▇ 7. A shipowner must pay maintenance and cure even where the seaman's injury or illness occurs through no fault of the shipowner. *Stevens v. McGinnis, Inc.,* 82 F.3d 1353, 1357 (6th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 433, 136 L.Ed.2d 331 (1996) (citing *Calmar S.S. Corp. v. Taylor,* 303 U.S. 525, 527, 58 S.Ct. 651, 652–53, 82 L.Ed. 993 (1938)). Nor does the seaman have to prove that his illness or injury resulted in any way from his employment; it is enough that the symptoms "manifest" themselves during the employment. *Id.* A pre-existing condition will bar recovery of maintenance and cure only where the seaman has intentionally misrepresented his condition, and that misrepresentation was material to the employer's decision to hire him. *Deisler v. McCormack Aggregates Co.,* 54 F.3d 1074 (3d Cir.1995). No such facts are alleged here, and plaintiff's testimony that defendant did not request a medical history or require an examination before hiring him is uncontroverted. (Tr. A178) Despite the parties' wrangling over whether plaintiff's symptoms were caused by his injuries or by his arthritis, the fact is that the source of his symptoms does not affect defendant's liability for maintenance and cure. Defendant must pay maintenance and cure until such time as plaintiff reaches maximum cure for whatever illness or injury, or combination thereof, caused him to begin experiencing symptoms while in the service of the ship.

▇▇▇ 8. The medical experts, including plaintiff's own physician, Dr. LeRoy, agree that plaintiff had an osteoarthritic condition in his spine prior to the dates of his injuries. The court concludes this pre-existing condition was at least temporarily exacerbated by his injuries on board defendant's vessel. Since he began to experience the symptoms of this degenerative disorder while in the service of defendant's ship, defendant must provide maintenance and cure until competent medical authority declares the disease

either cured or incurable. Due to the utter lack of testimony or other evidence of record as to whether plaintiff's degenerative arthritis has ever been declared permanent and incurable, the court concludes that plaintiff has not reached maximum cure. Based on the record as it now stands, it is impossible to determine when maximum cure will occur.

■ 9. Although plaintiff has not reached maximum cure, the court may not award a lump sum for future maintenance and cure. *Cox v. Dravo*, 517 F.2d at 625.

■ 10. The purpose of maintenance is to provide food and lodging for the seaman during his period of recovery at a level "comparable in quality to that the seaman is entitled to at sea." *Barnes v. Andover*, 900 F.2d at 634–35. Relying on *Barnes*, defendant contends that because plaintiff never received food or lodging aboard the vessel while employed, he is not entitled to a maintenance award. Defendant is correct that the holding of *Barnes* is limited to those who, like the plaintiff in that case, are "blue water" seamen. However, the court disagrees with defendant's characterization of the Third Circuit's analysis of the right to maintenance in that case. While recognizing that "there is some logic in [the] contention that allowing maintenance for shorebound seamen constitutes a double recovery," the court cited with approval the broad view of the right taken by Judge Alvin Rubin in *Hudspeth v. Atlantic & Gulf Stevedores, Inc.*, 266 F.Supp. 937, 943 (E.D.La.1967):

> To deny [maintenance to a seaman] because he does not receive lodging and meals aboard ship raises problems that would distort the simple lines of the maintenance remedy.... Indeed, the rationale that maintenance is allowable only when meals would have been served aboard challenges the now well settled doctrine that the disabled seaman is entitled to be paid maintenance beyond the end of his voyage, for were maintenance to be allowed only for those days during which the ship would

have served him meals, it would end when the voyage was over.

*Barnes v. Andover*, 900 F.2d at 642–43.[9] The Third Circuit also relied on a Second Circuit decision in which the court noted, "[w]e know of no authority, however, for holding that a seaman is not entitled to the traditional privileges of his status merely because his voyages are short, because he sleeps ashore, or for other reasons his lot is more pleasant than that of most of his brethren." *Id.* at 642 (quoting *Weiss v. Central Ry.*, 235 F.2d at 313). Based on this analysis, the court concludes that plaintiff is entitled to maintenance.

11. While plaintiff is entitled to an award of maintenance, the scope of expenses he has claimed as part of such an award vastly exceeds the proper scope of the remedy. Maintenance covers only food and lodging. As the Third Circuit explained in *Barnes*, "because maintenance has traditionally been described as payment for 'food and lodging,' we see no reason why automobile expenses other than for medical transport should be borne by the shipowner in any category or why toiletries should be included as maintenance." *Id.* at 644. While certain home maintenance expenses, such as utilities and home insurance, fall into the category of lodging, maintenance clearly does not cover items such as clothing, animal feed, capital improvements, telephone bills, toiletries, appliances, parking, travel to one's attorney's office, trips to visit relatives, or any other expenses not directly related to feeding or housing plaintiff. Automobile expenses (listed by the Third Circuit as "gas, oil and insurance," *id.* ) incurred for the sole purpose of obtaining medical care fall into the category of cure. All other automobile expenses are excluded from maintenance and cure.

■ 12. Maintenance also does not cover expenses incurred by family members or others on behalf of the injured seaman in the absence of both a promise and an obligation to repay:

9. As further discussed by the Third Circuit in *Barnes*, the Second Circuit has observed that depriving shore-based seamen of the maintenance remedy would place such individuals in

the position of being protected by neither maintenance nor workers' compensation. *Id.* at 644 (citing *Weiss v. Central Ry.*, 235 F.2d 309, 313 (2d Cir.1956)).

Because maintenance is intended to substitute for the food and lodging that a seaman enjoyed at sea, it is established that the seaman is entitled only to expenses actually incurred. Thus, if a seaman is not charged for hospitalization or lives with his family without incurring any expense or liability for his care, no maintenance is due. On the other hand, a seaman living with his family is entitled to maintenance if he shows that he paid his family for his room and board or that he had promised that he would and was obliged to do so.

*Barnes v. Andover*, 900 F.2d at 641 (citations omitted). Plaintiff has provided numerous receipts and ample testimony about food expenditures covered by his parents, friends, and current and former romantic partners, but has offered little testimony and no argument about whether he has incurred an obligation to repay these individuals.

13. It would be gratifying to see those individuals who selflessly and at great expense to themselves provided for plaintiff in his time of need compensated for their contributions. The law, however, does not permit such a recovery in cases where plaintiff did not assume a clear obligation of repayment. Such an outcome, while harsh in some circumstances, counterbalances the breadth of the shipowner's duty to provide maintenance to the "poor and friendless" seaman regardless of the cause of his injury. The court will address the various items of maintenance in turn:

### a. Food

The court has found that 100% of plaintiff's food was provided by friends and family members. Of these individuals, the court found that plaintiff had assumed an obligation to repay only Paula Cline. Therefore, plaintiff may recover only the $2.50 per day, from April 15, 1994 until the date of trial, that he owes Ms. Cline for the food she provided him. The total amount due for maintenance pertaining to food is $2,437.50.

### b. Lodging Expenses

It is undisputed that plaintiff's father, Ralph Smith Sr., paid plaintiff's property taxes, at least some of his electric bills, home insurance, and some heating oil bills. Unlike other friends and members of plaintiff's family, however, Mr. Smith Sr. characterized those expenditures as "loans" and kept a rather fastidious accounting of the amounts expended on his son's behalf. (PX 33 at 22) While plaintiff himself did not testify that he was obligated to repay his father, there is enough evidence in the senior Mr. Smith's testimony to support a finding that he did expect repayment, and that his expectation was based on plaintiff's assumption of an obligation to repay. Therefore, plaintiff may recover the following lodging-related expenses:

i.) Electricity bills, at an average of $96 per month;

ii.) Property insurance, at $150 per year; [10]

iii.) Heating oil, at $357 per year, less the one-time gift of $100 from Martha Watts; and

iv.) Homeowner insurance, at $191 per year.

14. While *Barnes v. Andover* proscribes recovery for items of maintenance provided gratis by family members, the case makes no mention of whether such a rule applies to items of cure. The court concludes that it does not. The purpose of maintenance is to compensate the injured or ill seaman for food and lodging he would otherwise have received aboard ship, so as to avoid the possibility that he will be stranded "in foreign ports suffer[ing] the accumulated evils of disease, and poverty, and sometimes perish[ing] from the want of suitable nourishment." *Harden v. Gordon*, 11 F.Cas. 480, 482–83 (C.C.Me.1823). When a seaman receives food and lodging from friends or family members, barring recovery of maintenance amounts not actually incurred by the seaman does not impede the goal of assuring that the seaman has food and lodging during his recuperation. Cure, on the other hand, does not substitute for something the seaman already

---

10. While it is undisputed that the property tax bills covered two properties, neither party offered any basis for allocating the bill between the properties. The court will permit plaintiff to recover half of the estimated amount.

received on the ship; it becomes necessary only because of the illness or injury. While a seaman's family might provide him with food and lodging while he is on shore regardless of whether he is injured, cure represents an exceptional expenditure.

Moreover, the court is bound to construe the right to cure liberally. Absent any authority explicitly limiting the duty of shipowners to pay cure to those expenditures made by the seaman himself, the court declines to impose such a limitation.

██ 15. Defendant objects to the inclusion of chiropractic care, Dr. LeRoy's treatments, pain medication, and most other claimed items of cure on the basis that they are merely palliative treatments and thus not compensable under *Cox v. Dravo*, 517 F.2d at 627. In *Cox*, however, as well as in each of the other cases cited by defendant as standing for the proposition that palliative treatments are not compensable, there was a diagnosis of maximum cure on the record. In the present case, however, the court has found that no medical diagnosis of permanency has been made, and that therefore plaintiff has not reached maximum cure. In light of the liberal construction courts have traditionally given the duty of cure, the court concludes that plaintiff is entitled to recompense for any and all medical treatments he has received.

16. The following amounts are due plaintiff as cure:

### a. Massage Therapy

██ As noted above, plaintiff expended $350 for massage therapy provided by Barbara Lake. Because this treatment, albeit palliative in nature, relieved plaintiff's symptoms during the time before maximum cure was reached, plaintiff is entitled to recover the $350 that he has actually expended in obtaining this care.

Plaintiff is not, however, entitled to recover an additional $552.87 in expenses relating to Ms. Lake's services which he claims in his brief. Ms. Lake has never billed plaintiff for this additional amount, which comprises discounts, mileage charges, and telephone calls to plaintiff. There is no evidence of record to indicate that plaintiff will ever be billed for these charges, or that Ms. Lake expects to collect on them. Moreover, plaintiff has presented no authority supporting his asserted right to receive such an amount. The amount of cure due relating to treatments by Ms. Lake, therefore, is limited to $350.

### b. Chiropractor

Plaintiff's bills, paid and unpaid, for chiropractic care total $16,388.50. There is no dispute over this amount, aside from defendant's claim that the charges were incurred after plaintiff had reached maximum cure. Because the court has found otherwise, plaintiff is entitled to recover the full amount of Dr. Stump's bills.

### c. Dickinson Medical Group

Plaintiff is entitled to recover the entire $359.80 shown outstanding on the bill submitted.

### d. Dr. LeRoy

Plaintiff owes $16,875 in fees to Dr. LeRoy. Although Dr. LeRoy testified that he continued to treat plaintiff out of humanitarian concerns, the court concludes that Dr. LeRoy has merely postponed, rather than waived, his fees. Plaintiff, therefore, is entitled to recover $16,875, the full amount of this bill.

### e. Other Medical Treatment

██ Because the sigmoidoscopy performed by Dr. Wagner and the barium enema at Milford Memorial Hospital were necessitated by the side effects of the medication plaintiff took to control his pain, he is entitled to recover the $553 charged for those services. He may also recover the $151 he owes Milford Radiology Associates and the $333 charge from Christiana Imaging Center for the 1992 set of MRIs. He may not, however, recover the $2,295 owed for the November 1996 set of MRIs. When plaintiff introduced the exhibit containing this bill, defendant objected on the ground that the MRIs were performed for litigation rather than health care purposes. (Tr. B156) Plaintiff has not

responded to this contention, nor has he produced any testimony that the MRIs were ordered for curative or diagnostic, as opposed to litigation, purposes. Given the timing and comprehensiveness of the tests, the court agrees with defendant on this point and will bar recovery for this last set of MRIs.

### f. Medical Supplies and Prescriptions

The pharmacy receipts submitted by plaintiff reveal a total outlay by him of $1,743.82. (PX 55a) In his post-trial brief, plaintiff claims $2,205.18, relying only on the receipts as a source for the amount included. The court assumes that this is a clerical error. Plaintiff is entitled to the $1,743.82 shown on the receipts.

■ Plaintiff claims a total of $8,657.50 in cure relating to the whirlpool spa recommended by Dr. Stump. Although it is far from clear that such a treatment is medically indicated for plaintiff's condition, it was recommended by a health care provider, and plaintiff's companion testified that it brought him some relief from pain. Therefore, the court will permit recovery of whirlpool-related expenses, but only those that have been properly documented. Exhibit 46, to which plaintiff refers in justifying the full amount claimed, includes legitimate receipts for a total of $4,269.19. Plaintiff may recover this amount only.

Plaintiff has also claimed $20 for a home traction unit and $70 for liquid insoles for his shoes. Because there is testimony that Dr. Sutton prescribed the home traction unit, plaintiff may recover the estimated $20 spent on that item. As for the liquid insoles, however, plaintiff has produced only his own, ambiguous testimony as to their medical utility. The court concludes that the insoles are not a medical expense, and therefore not recoverable as cure.

### g. Dental and Eye Care

■ Plaintiff has submitted dental bills totaling $77 and records indicating localized advanced periodontitis. (PX 49, 50) He claims that defendant should be liable for his dentist bills because his injuries rendered him unable to brush his teeth properly. Dr. Kramer, plaintiff's dentist, did not testify at trial and did not indicate in his records whether any dental problems experienced by plaintiff related in any way to a disease or injury suffered while in the service of defendant's vessel. Moreover, plaintiff himself did not testify that he experienced any problems with his teeth while in the employ of defendant, and he waited more than four years after leaving his employment to seek dental care. The court concludes that these bills are not a proper element of cure in this case.

■ Plaintiff also claims to have incurred opthalmologist and optometrist bills due to the effects of his injuries on his vision. He claims to experience blurred vision, loss of color perception and occasional blindness. An examination by Dr. Frederick Cook, an opthalmologist, revealed "very early pterygium," "very early pinguecula," "a small vitreous floater," and a need to increase plaintiff's bifocal prescription strength. (PX 53–54) Dr. Cook's records do not explain or define these terms, nor do they offer an opinion as to the cause of the irregularities found. Dr. Cook did not testify at the trial. Because there is no indication in the record that plaintiff either began experiencing problems with his vision during his employment with defendant or that his difficulties stem from either his injuries or his arthritis, these bills, as well, will be excluded from the amount of cure due.

### h. Automobile Expenses

■ The Third Circuit in *Barnes* mentioned gas, oil, and insurance as allowable automobile expenses relating to cure. *Barnes v. Andover*, 900 F.2d at 644. Of the three, plaintiff has offered evidence only of car insurance, in the amount of $169 per year. (PX 64; Tr. B148) Plaintiff has introduced no evidence of gas or oil usage for trips relating to medical care. He has estimated the mileage and number of trips for each care provider, but has provided no authority for his asserted reimbursement rate of $.29 per mile. The court, therefore, can do no more for plaintiff than permit recovery of his $169 per year in insurance costs.

### i. Surgery

Although plaintiff expended considerable efforts both at trial and during post trial briefing to demonstrate that plaintiff is in need of a surgical procedure costing, by Dr. LeRoy's estimate, upward of $5,000, plaintiff has not included any claim for this amount. To the extent that plaintiff did intend to claim this amount for future treatment, such a claim is denied for two reasons: 1) a lump sum payment for future cure, as noted above, has been expressly disapproved by the Third Circuit in *Cox v. Dravo*, 517 F.2d at 625; and 2) the surgery contemplated by plaintiff would, according to Dr. LeRoy, correct the problem of a herniated disc. Because the medical evidence establishes that the source of plaintiff's symptoms is degenerative arthritis rather than a herniated disc, and there is no evidence of record to establish that such surgery would be indicated for the former problem, there is no basis for awarding a sum for such a treatment.

17. Plaintiff, without citing any authority in support of such a claim, contends that he is entitled to prejudgment interest, at an unspecified rate, as of January 11, 1991. Defendant, in its post trial brief, did not address the issue of prejudgment interest at all. As the Third Circuit noted in *Deisler v. McCormack Aggregates Co.*, 54 F.3d 1074, 1087 (3d Cir.1995) which, like the case at bar, addressed claims under the general maritime law, "prejudgment interest has traditionally been considered part of the compensation due to a plaintiff." The court concludes that plaintiff is entitled to prejudgment interest. However, in the absence of any discussion or citation to authority in the parties' briefs, the court is unable to determine at what rate or over what period of time interest should be awarded.

## IV. CONCLUSION

For the reasons stated above, the court finds that as of the date of the trial, plaintiff had not yet reached maximum cure. Defendant, therefore, will be ordered to pay plaintiff maintenance and cure, plus interest, from the date plaintiff ceased work until the date of trial, as specified in this opinion, less the amount already paid by defendant.