**DELAWARE RIVER & BAY AUTHORITY, Appellant in No. 08–4029**

v.

**Jan D. KOPACZ, Appellant in No. 08–4086.**

Nos. 08–4029, 08–4086.

United States Court of Appeals, Third Circuit.

Argued May 21, 2009.

Filed Sept. 25, 2009.

Mary E. Reeves, Esq. [Argued], Donna Adelsberger & Associates, Glenside, PA, for Appellant/Cross Appellee.

E. Alfred Smith, Esq. [Argued], E. Alfred Smith & Associates, Wayne, PA, for Appellee/Cross Appellant.

Before: RENDELL, STAPLETON and ALARCÓN *, Circuit Judges.

## OPINION OF THE COURT

RENDELL, Circuit Judge.

In this appeal from the District Court's award of declaratory judgment in favor of defendant Jan Kopacz, and against plaintiff Delaware River & Bay Authority ("DRBA"), we are called upon to decide two issues of admiralty law: (1) whether commuter seamen, who eat and sleep on land, are entitled to "maintenance and cure"—payment from a shipowner to a seaman to cover medical, food, and lodging expenses during the seaman's recovery

---

* Honorable Arthur L. Alarcón, Senior Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

from illness or injury; and (2) if so, whether a shipowner is relieved of its maintenance and cure obligation when the injured seaman receives Social Security disability benefits and long-term disability payments provided by the shipowner. Relying on our opinions in *Barnes v. Andover Company, L.P.*, 900 F.2d 630 (3d Cir.1990), and *Shaw v. Ohio River Company*, 526 F.2d 193 (3d Cir.1975), the District Court concluded that commuter seamen are entitled to maintenance and cure, independent of other benefits paid to the seaman. Accordingly, the District Court awarded Kopacz maintenance of $50,790.00, plus prejudgment interest of $2,204.29, but denied Kopacz's claim for consequential damages, including lost wages, pain and suffering, and attorney's fees and costs. Both parties timely appealed.

DRBA's central contention on appeal is that payment of maintenance would produce a "double recovery," because Kopacz's wages already enabled him to procure food and housing on land, and because Social Security disability and long-term disability payments made to Kopacz adequately covered his living expenses. DRBA argues, further, that the award of prejudgment interest was punitive and thus impermissible. The sole argument advanced in Kopacz's cross-appeal is that consequential damages were improperly denied. Finding no error in the District Court's thoughtful resolution of these issues, we will affirm its order.

## I. Background

■ Maintenance is the payment by a shipowner to a sailor for the sailor's food and lodging costs incurred while he is ashore as a result of illness or accident. *Barnes*, 900 F.2d at 631. A common law remedy, maintenance, derived from medieval maritime codes, was incorporated into American jurisprudence nearly two centuries ago. *Harden v. Gordon*, 11 F.Cas. 480, 482–83 (C.C.D.Me.1823) (No. 6,047); *see The Osceola*, 189 U.S. 158, 175, 23 S.Ct. 483, 47 L.Ed. 760 (1903). Its original purpose was clear and compelling—to ensure injured seamen funds adequate to cover basic living expenses during their recovery. The imposition of such a duty, it was felt, would benefit both shipowners and seamen, by encouraging shipowners to implement appropriate safeguards to protect sailors, and by encouraging seamen to undertake hazardous voyages:

> Seamen are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and exhausting labour. They are generally poor and friendless, and acquire habits of gross indulgence, carelessness, and improvidence. If some provision be not made for them in sickness at the expense of the ship, they must often in foreign ports suffer the accumulated evils of disease, and poverty, and sometimes perish from the want of suitable nourishment.... If these expenses are a charge upon the ship, the interest of the owner will be immediately connected with that of the seamen. The master will watch over their health with vigilance and fidelity.... Even the merchant himself derives an ultimate benefit from what may seem at first an onerous charge. It encourages seamen to engage in perilous voyages with more promptitude, and at lower wages. It diminishes the temptation to plunderage upon the approach of sickness; and urges the seamen to encounter hazards in the ship's service, from which they might otherwise be disposed to withdraw.

*Barnes*, 900 F.2d at 633 (quoting *Harden*, 11 F.Cas. at 483).

Since *Harden* was decided almost 200 years ago, the lot of the "poor and friend-

less" seaman has improved considerably. As we noted in *Barnes,* union contracts may guarantee sailors a host of benefits, including overtime and premium pay, vacation allowances, disability pensions, and various amenities, including televisions and washers and dryers. 900 F.2d at 637. The emergence of these contractually-guaranteed benefits, however, has not diminished our historic solicitude toward seamen, who continue to be viewed by the law as "wards of the admiralty." *Id.* at 636–37. Accordingly, maintenance, a duty that is "annexed to the employment contract," that "attaches once the seaman enters the service of the ship," and that "no private agreement is competent to abrogate," has retained its vitality in the modern era. *Id.* at 636.

DRBA guarantees many of the benefits discussed above to its seamen. The interaction of these benefits and the maintenance obligation lies at the heart of this appeal.

A permanent full-time employee of DRBA who suffers an injury on the job is entitled to full wages for the first 90 days of disability. Thereafter, the employee is entitled to benefits equivalent to 60% of his wages, which are paid through a long-term disability ("LTD") policy funded wholly by DRBA, and administered by Hartford Insurance Company ("Hartford").[1] The personnel manual provided to Kopacz sets forth the purpose of LTD benefits—to "provide a continuing income should the employee's ability to earn a

living be interrupted or terminated by a prolonged disability." A. 6–7.

The duty to provide LTD benefits stems from a provision in the collective bargaining agreement between DRBA and its marine employees, providing that, "Employer agrees to continue to provide all permanent full-time employees long-term disability plans that are offered to ... employees generally." A. 7. The agreement makes no mention of maintenance payments, and DRBA does not maintain an insurance policy specifically to cover its maintenance obligation to seamen.

In the event of a delay in the payment of LTD benefits, an injured sailor also receives the value of his sick and annual leave. According to DRBA's risk manager, Bonnie Miller, the payment of annual leave is distinct from maintenance and is merely a stop-gap to enable an injured seaman to cover his living expenses during the pendency of his LTD application.

Kopacz suffered a debilitating back injury in December 2004 and was subsequently deemed unfit to return to duty by DRBA. As a full-time permanent employee, Kopacz received his full wages for 90 days following the date of his disability, equivalent to approximately $9,900. Kopacz also received the value of his sick and annual leave, equivalent to approximately $4,600. Thereafter, Hartford paid Kopacz monthly LTD benefits of $2,192 for 17 months, beginning in April 2005 and ending in September 2006.[2] DRBA did not

---

**1.** Hartford calculates an employee's monthly LTD benefit by: (1) multiplying the monthly income loss by the benefit percentage; (2) comparing the result with the maximum benefit; and (3) deducting other income benefits, including Social Security disability payments, from the lesser amount.

**2.** DRBA also mistakenly transmitted three checks, totaling $1,770.00, to Kopacz. Miller explained that this was done because the pri-

or plan administrator required DRBA to pay seamen "maintenance wages" in the amount of $450 per month, or $15 daily—payments which were then deducted from the LTD benefit paid to seamen. Accustomed to making these payments, DRBA inadvertently sent Kopacz checks with notes indicating that the payments constituted "maintenance wages" for the period between April 2005 and July

make separate maintenance payments to Kopacz, nor did Kopacz request them.

Because Hartford also required injured seamen to apply for Social Security disability ("SSD") benefits, which, if approved, would be deducted from monthly LTD benefits, Kopacz submitted an application for SSD benefits in October 2006. After approval of Kopacz's application, the Social Security Administration transmitted a check to him in the amount of $17,142.00, representing his total benefits retroactive to July 2005, and thereafter provided monthly payments of $1,167.00.

Upon discovering the payment of $17,142.00, Hartford demanded reimbursement of slightly less than this sum[3] and advised Kopacz that his LTD benefit would thereafter be reduced by the amount of his monthly SSD payment. After Kopacz refused to reimburse Hartford, it suspended payment of LTD benefits. Shortly thereafter, Kopacz advised DRBA that it, not he, was required to reimburse Hartford for this sum; when DRBA declined to do so, this suit followed.

DRBA sued Kopacz in the United States District Court for the District of Delaware, seeking a declaratory judgment that DRBA did not owe Kopacz maintenance and cure. After a one-day bench trial, the District Court concluded that Kopacz was entitled to maintenance in the amount of $50,790.00, plus prejudgment interest of $2,204.29. However, the District Court denied Kopacz's claim for consequential damages, including lost wages, pain and suffering, and attorney's fees and costs.[4] Both parties timely appealed.[5]

DRBA contends that commuter seamen, who eat and sleep ashore, are ineligible for maintenance. It also argues, in the alternative, that the District Court should have deducted other payments made to Kopacz, including LTD and SSD, from the amount of maintenance owed to Kopacz—a result that, DRBA maintains, is necessary to avoid double recovery. Further, DRBA contends that the award of prejudgment was punitive, rather than compensatory, and thus impermissible. Kopacz's cross-appeal urges that the District Court improperly denied his claim for consequential damages.

## II. Discussion

### A. Commuter Seamen

DRBA asks the Court to adopt a *per se* rule denying maintenance to commuter seamen. DRBA observes that the ratio-

---

2005, and that the payments offset Kopacz's LTD benefit.

3. The amount of reimbursement requested—$16,607.92—was slightly less than the lump sum amount received from the Social Security Administration due to differences in the eligibility dates under the Hartford policy and the Social Security disability program.

4. The parties stipulated that Kopacz's monthly living expenses were $2,190.00 in the time period beginning in January 2005 and ending in April 2007, that Kopacz attained his point of maximum medical improvement on the latter date, and that the monthly SSD benefits of $1,167.00 represented Kopacz's sole source of income since October 2006, with the excep-

tion of interest earned on a money market account. All of Kopacz's documented medical expenses have been paid, and Kopacz has made no claim for cure.

5. The District Court had subject matter jurisdiction over this admiralty action under 28 U.S.C. § 1333. We have appellate jurisdiction over the final judgment of the District Court under 28 U.S.C. § 1291. We review the District Court's findings of fact under a clearly erroneous standard. *See Sheet Metal Workers Local 19 v. 2300 Group, Inc.*, 949 F.2d 1274, 1278 (3d Cir.1991). However, our review of the District Court's application of the law to these facts is plenary. *See Tudor Dev. Group v. United States Fidelity & Guar. Co.*, 968 F.2d 357, 359 (3d Cir.1992).

nale for maintenance—to provide seamen compensation equivalent to food and lodging received at sea—is inapplicable to commuter seamen, who eat and sleep ashore. DRBA argues, further, that the wages of commuter seamen are already computed with the expectation that they will pay for their own food and housing expenses on land and, therefore, an award of maintenance would produce an unjustified windfall. DRBA maintains that, based on these concerns, we left "open the question" of whether commuter seamen are entitled to maintenance in *Barnes,* 900 F.2d at 643.

Our inquiry begins with *Barnes.* There, we considered whether a blue water seaman, who maintained a home ashore, was entitled to include in his calculation of maintenance expenses incurred in connection with his permanent lodging, or whether he was solely permitted to recover the incremental costs attributable to his presence on land, including food, laundry, and gas. In approving Barnes's recovery of costs associated with his permanent lodging, we cited precedents awarding maintenance to commuter seamen:

> Many of the reasons given by the courts for awarding maintenance to land-based seamen who, by definition, ordinarily incur their own expenses for food and lodging are also applicable to inclusion in maintenance of the prorated costs of permanent lodging by a blue water seaman: the status of seamen as wards of the admiralty, *Weiss,* 235 F.2d at 313; *DuPlantis,* 298 F.Supp. at 14–15 & n. 3; consistency with maritime tradition, *Weiss,* 235 F.2d at 313; *DuPlantis,* 298 F.Supp. at 14–15[;] and the need to provide support to those who are ineligible for workman's compensation or other means of support. *Weiss,* 235 F.2d at 313.

*Id.* at 642.

Despite our reliance on these precedents in *Barnes,* DRBA insists, "This Circuit has

left open the question of whether a commuter seaman, such as Kopacz, is even entitled to maintenance in the first place." Appellant's Br. at 14. Although *Barnes* acknowledged that there was "some logic" in denying maintenance to shore-based seamen, the court stressed that the "life of the law" is "experience," not "logic." *Id.* at 643. *Barnes* then reiterated Congress and the Supreme Court's "long-established solicitude" to seamen, the "liberal attitude" regarding the scope of maintenance, and the interpretative canon requiring that ambiguities in regard to maintenance be "resolved in favor of the seaman"—all considerations that, *Barnes* concluded, supported an expansive understanding of the right to maintenance. *Id.* at 637, 643 (citing *Vaughan v. Atkinson,* 369 U.S. 527, 532–33, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962)). *Barnes* also quoted at length from an opinion rejecting a position identical to that urged by DRBA:

> To deny [maintenance to a seaman] because he does not receive lodging and meals aboard ship raises problems that would distort the simple lines of the maintenance remedy.... Indeed, the rationale that maintenance is allowable only when meals would have been served aboard challenges the now well settled doctrine that the disabled seaman is entitled to be paid maintenance beyond the end of his voyage, for were maintenance to be allowed only for those days during which the ship would have served him meals, it would end when the voyage was over.

*Id.* at 642 (quoting *Hudspeth v. Atlantic & Gulf Stevedores, Inc.,* 266 F.Supp. 937, 943 (E.D.La.1967)); *see Smith v. Del. Bay Launch Serv., Inc.,* 972 F.Supp. 836, 849 (D.C.Del.1997); *see also Crooks v. United States,* 459 F.2d 631, 634–35 (9th Cir.1972) ("[T]he maintenance remedy should be

kept simple, uncluttered by fine distinctions which breed litigation, with its attendant delays and expenses.") (internal citation omitted). Hence, *Barnes* strongly suggested that commuter seamen are also entitled to maintenance.

■ Today, we make explicit what was implicit in *Barnes:* commuter seamen enjoy the same right to maintenance as their blue water counterparts. Although DRBA's concerns relating to other payments have merit, we do not write on a blank slate. *Id.* at 637 (noting the Court's "clear and frequent pronouncements" that seamen remain wards of the admiralty). Rather, our analysis is informed by nearly two centuries of jurisprudence "consistently expand[ing] the scope of the right [to maintenance]." *Id.* at 633. In *Vaughan*, decided over one hundred years after the introduction of maintenance into admiralty law, the Supreme Court stressed the continued status of seamen as "wards" of admiralty and the need for "liberal" interpretation of the maintenance obligation. 369 U.S. at 532, 82 S.Ct. 997.

Notwithstanding our dissenting colleague's vigorous argument that the maintenance and cure obligation does not arise when the seaman is a commuter, we find no such limiting principle—or inclination to curtail this historic remedy—in the applicable jurisprudence.[6] As much as we might have expected the Supreme Court in 1962 to modify the traditional maintenance obligation to reflect changes in the modern seaman's lifestyle, it did no such thing. To the contrary, the Court, stressing the expansive nature of this right, declined to fashion exceptions to the shipowner's longstanding duty to provide maintenance and cure:

Admiralty courts have been liberal in interpreting this duty 'for the benefit and protection of seamen who are its wards.' We noted in *Aguilar v. Standard Oil Co.,* that the shipowner's liability for maintenance and cure was among 'the most pervasive' of all and that it was not to be defeated by restrictive distinctions nor 'narrowly confined.' When there are ambiguities or doubts, they are resolved in favor of the seaman. *Id.* at 531–32, 82 S.Ct. 997 (internal citations omitted). And, in fact, DRBA cites no authority supporting withholding maintenance from commuter seamen. *See id.* at 642 (quoting *Weiss v. Central R.R. Co. of N.J.,* 235 F.2d 309, 313 (2d Cir.1956) ("We know of no authority . . . for holding that a seaman is not entitled to the traditional privileges of his status merely because his voyages are short, because he sleeps ashore, or for other reasons his lot is more pleasant than that of most of his brethren.")); *Bailey v. City of N.Y.,* 55 F.Supp. 699, 701 (S.D.N.Y.1944), *aff.,* 153 F.2d 427 (2d Cir.1946) (awarding maintenance to land-based seaman after finding no authority for narrow construction of the right); *see also Crooks,* 459 F.2d at 633 ("Thus we find the obligation of maintenance enforced even where maritime compensation did not include board and lodging-where the seaman was expected to pay for his meals out of his wages. No matter what the terms of his maritime employment were, during the period of his disability he was entitled to be provided with maintenance as well as cure."); *The City of Avalon,* 156 F.2d 500, 501 (9th Cir.1946) (holding that seaman could recover cost of food as element of maintenance, even where shipowner had not paid for his meals).

---

6. Kopacz's claim rests upon the age-old common law doctrine of maintenance and cure, not the Shipowners' Liability Convention.

Nothing in that Convention purports to alter the right Kopacz here asserts.

In short, "[t]he Supreme Court has shown no inclination to depart from its long-established solicitude for seamen," despite the protections afforded modern seamen. *Barnes,* 900 F.2d at 637. Until it does so, we decline to depart from the "uniformly enforced" rule entitling deep water and commuter seamen to maintenance. *Weiss,* 235 F.2d at 313.

### B. Long–Term Disability Benefits

■ Having established Kopacz's general eligibility for maintenance, we turn to DRBA's alternative contention—that LTD payments satisfied its maintenance obligation. *Shaw v. Ohio River Company* governs when other payments received by an injured seamen satisfy a shipowner's maintenance obligation. 526 F.2d at 200. There, we considered whether benefits paid to a seaman under a disability policy funded by the shipowner, and administered by Prudential Insurance Company ("Prudential"), relieved the shipowner of its maintenance duty. *Id.* We attached primary importance to the "character" of the benefit conferred. *Id.* We explained that where a benefit is part of the seaman's wage package, it will be deemed separate and independent of the shipowner's maintenance obligation; accordingly, payment of the benefit will not relieve the shipowner of its maintenance duty. Considerations supporting characterization of a benefit as "wages" rather than maintenance include that: (1) the benefit is mandated under a wage agreement between the employer and the seaman; (2) the absence of any contractual provision indicating that the benefit is in lieu of, or in satisfaction of, the employer's maintenance obligation; (3) the purpose of the benefit is to replace lost wages; and (4) the benefit is recoverable, even where the seaman does not satisfy the maintenance requirements. *Id.* In *Shaw,* all four factors supported classification of disability benefits

as a substitute for wages: (1) the benefits were guaranteed in a collective bargaining agreement governing employee compensation; (2) the shipowner did not specify that disability payments were in lieu of maintenance; (3) employees were entitled to the benefits, even if they did not satisfy the conditions required to recover maintenance; and (4) the benefits, designed to replace lost wages, were not narrowly tailored to cover food and lodging expenses. *Id.* Accordingly, we concluded that the payment of disability benefits did not relieve the shipowner of its maintenance obligation.

On the other hand, we concluded in *Shaw* that health benefits provided to the seaman *did* satisfy the shipowner's duty to provide "cure"—the payment of a seaman's medical expenses during his convalescence. Under the relevant policy, which was fully funded by the shipowner and administered by Blue Cross–Blue Shield, all of the injured seaman's medical expenses were covered. Because the benefits were narrowly tailored to satisfy the shipowner's "cure" duties, we concluded that additional payments to the seaman were not required.

Here, the District Court, applying the considerations discussed in *Shaw,* found that the LTD benefits were part and parcel of Kopacz's wage package. It specifically noted that: (1) DRBA extended LTD benefits to all permanent full-time employees, including personnel ineligible for maintenance at common law; (2) the employee manual characterized LTD benefits as "continuing income," not as payment for food and lodging; (3) the collective bargaining agreement did not expressly indicate that LTD benefits were in lieu of maintenance; and (4) disability benefits were awarded, even when the maintenance

requirements were not met.[7] Nothing "connected" the insurance payments to food and lodging, or the maintenance offered as such. Accordingly, the District Court concluded that DRBA's maintenance obligation was not satisfied by the payment of LTD benefits.

DRBA attempts to distinguish the Prudential payments in *Shaw* from the LTD benefits paid here. DRBA insists that the collective bargaining agreement here is silent on LTD benefits. To the contrary, the document expressly provides, "Employer agrees to continue to provide all permanent full-time employees long-term disability plans that are offered to ... employees generally." A. 7, 553, 563–64. The inclusion of this guarantee in the collective bargaining agreement thus supports classification of LTD benefits as a substitute for wages, not maintenance.

In *Shaw*, we scrutinized the record for clear written evidence that the shipowner intended disability benefits to satisfy its maintenance duty. We stated, "[T]he collective bargaining agreement in this case contained *no provision* specifying that payments from the insurance company under the benefits plan would be in lieu of maintenance. Undoubtedly a vessel owner could insure against his maintenance obligation by a benefits program tailored to that end but there is *no indication in the collective bargaining agreement* before us that this was done." 526 F.2d at 200 (emphasis added); *see also id.* at 199 ("It is clear that in the absence of an *explicit contractual provision* specifying that accumulated leave time pay or other wages is to be deemed a substitute for maintenance, there is no basis for crediting such earned wages against the vessel owner's maintenance obligation.") (emphasis added).

Conceding that no such written evidence exists here, DRBA asserts that, instead, its evidentiary burden is satisfied by the existence of a "tacit and longstanding understanding" between the DRBA and its seaman that LTD benefits were in lieu of maintenance. Appellant's Br. at 20. DRBA relies on testimony offered by its risk manager, Bonnie Miller, that no employee had previously sued DRBA to recover both maintenance *and* disability benefits. This absence of suit, however, is readily explained—the prior plan administrator, Pennsylvania Manufacturer's Association, paid injured seamen "maintenance wages" of $15 daily. The absence of suit, therefore, is not indicative of a "tacit" understanding that LTD benefits would be provided in lieu of maintenance. In any event, speculation about why other DRBA employees refrained from suit is just that—speculation—and such circumstantial evidence is especially unpersuasive here, where all of the considerations identified as significant in *Shaw* support classification of the LTD payments as a wage substitute, not maintenance, and where LTD payments were not narrowly tailored to the essential purpose of maintenance-to cover food and lodging expenses during the seaman's recovery.

Unable to demonstrate that LTD payments were intended as maintenance, DRBA focuses on the underlying rationale for this right. DRBA contends that the historic purpose of maintenance—to provide an injured seaman funds adequate to cover basic living expenses—was met by the payment of LTD benefits, and that an additional award would produce an unjustified windfall for Kopacz. We considered—and rejected—a similar argument in *Barnes,* where we approved an award of

---

7. It is also worth noting that neither a seaman's actual nor his projected expenditures on food and lodging are factors in the computation of LTD payments and, therefore, LTD payments are not narrowly tailored to satisfy the shipowner's maintenance obligation.

maintenance to a unionized seaman, who received benefits similar to those afforded Kopacz:

> Andover is persuasive in arguing that today those seamen who are unionized are neither friendless nor improvident. The record in this case shows that the Seafarers International Union, to which Barnes belongs, has obtained for its members overtime and premium pay, vacation allowances, *disability pensions*, and amenities. Furthermore, the adjectives friendless and helpless were generally used to describe sailors in foreign ports. Now, under union contracts ill or injured seamen are quickly repatriated. The changed circumstances of the unionized seaman may undercut the rationale supporting the traditional right to maintenance and cure, at least for unionized seamen. However, the Supreme Court has shown no inclination to depart from its long-established solicitude for seamen. Until it does so, we see no basis to assume the emergence of powerful seamen's unions, a development concerning which the Court has full knowledge, justifies our ignoring the Court's clear and frequent pronouncements that seamen remain wards of the admiralty.

*Barnes*, 900 F.2d at 636–37 (internal citations omitted) (emphasis added); *see also Vaughan*, 369 U.S. at 533, 82 S.Ct. 997 (rejecting double recovery argument and finding that income earned by an injured seaman at non-maritime position during his recovery did not offset the amount of maintenance due).[8]

Hence, we conclude that the LTD payments do not offset the amount of maintenance owed to Kopacz, a duty that is independent of DRBA's contractual obligations. *See Barnes*, 900 F.2d at 636; *see also Vaughan*, 369 U.S. at 532, 82 S.Ct. 997 ("Maintenance and cure differs from rights normally classified as contractual.").

## C. Social Security Disability Benefits

■ Alternatively, DRBA maintains that Kopacz's receipt of SSD benefits satisfied its maintenance obligation, at least in part. For its position, DRBA relies on our statement in *Shaw* that a "vessel owner has no obligation to provide maintenance and cure if it is furnished by others at no expense to the seaman." 526 F.2d at 201.

In *Shaw*, discussed earlier, we held that Blue Cross–Blue Shield benefits satisfied the shipowner's cure obligation. We reasoned that these benefits, which covered the costs of the seaman's medical care and hospitalization, were the "exact[ ] equivalent" of "cure." *Shaw*, 526 F.2d at 201. Accordingly, we concluded that the parties intended the Blue Cross–Blue Shield payments be in lieu of, rather than in addition to, the "cure" owed to the injured sailor. However, we reached the *opposite* conclusion with respect to the Prudential disability benefits, which the record indicated were intended as a substitute for lost wages—not as payment for food and lodging—and which were owed to the seaman, independent of his eligibility for maintenance and cure. On that basis, we held that the Prudential payments did *not* offset the maintenance owed to the seaman. Distinguishing the Blue Cross–Blue Shield benefits from the Prudential payments, we explained,

---

**8.** DRBA also contends that requiring shipowners to pay maintenance, in addition to disability benefits, would discourage employers from offering such benefits. We disagree, and conclude, as the District Court did, that a shipowner may avoid "double" liability by specifying that disability benefits are intended to cover, in whole or in part, its maintenance obligation. *See Shaw*, 526 F.2d at 200.

[I]t is also true that the vessel owner has no obligation to provide maintenance and cure if it is furnished by others at no expense to the seaman.... The *essential difference* between the Blue Cross–Blue Shield and the Prudential payments [which do not satisfy the maintenance obligation] is that the former provides the *exact equivalent* of maintenance and cure whereas the latter, at least under this collective bargaining agreement, constitutes a substitute for lost wages which are owed to a seaman even if he is ineligible for maintenance and cure.

*Id.* at 201 (emphasis added). The dispositive issue here, therefore, is whether SSD benefits provide the "exact equivalent" of maintenance, or whether the two differ in their scope, purpose, and conditions of eligibility. *Id.*

SSD benefits and maintenance are distinguishable in several important respects. First, distinct policy aims underlie maintenance and SSD payments. Whereas maintenance is "intended to provide for the cost of food and lodging comparable in quality to that the seaman is entitled to at sea," *Barnes*, 900 F.2d at 634–35, SSD benefits "aim[ ] to replace the income of beneficiaries when that income is reduced on account of retirement and disability." *Temple Univ. v. United States*, 769 F.2d 126, 130 (3d Cir.1985); *see Barnes*, 900 F.2d at 634 (noting that maintenance does not entitle a seaman to a pension or a lump-sum payment to compensate for disability or lost earning capacity). Hence, SSD benefits are more closely analogous to LTD payments, which aim to replace lost wages, than to maintenance.

■ Second, the conditions of eligibility for maintenance and SSD payments differ substantially. Maintenance is available solely when a seaman: (1) is injured during the course of his employment or at a place where he is "subject to the call of duty," *Barnes*, 900 F.2d at 633 (citing *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 732, 63 S.Ct. 930, 87 L.Ed. 1107 (1943)); (2) is incapable of performing "seaman's work," *Vaughan*, 369 U.S. at 531, 82 S.Ct. 997; and (3) has "actually incurred" food and lodging expenses during his recovery. *Barnes*, 900 F.2d at 642; *see Vaughan*, 369 U.S. at 531, 82 S.Ct. 997 (noting that maintenance is limited to food and lodging expenses incurred); *Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 535 (9th Cir. 1962) ("Maintenance and cure is based upon need," and the seaman is under a duty to minimize expenditures). Maintenance, moreover, is available *immediately* upon the seaman's incapacitation, but *ceases* once the seaman attains "maximum cure," defined as the point at which he is either cured or his condition is diagnosed as permanent and incurable. *Barnes*, 900 F.2d at 633–34; *see Vella v. Ford Motor Co.*, 421 U.S. 1, 5, 95 S.Ct. 1381, 43 L.Ed.2d 682 (1975); *Crooks*, 459 F.2d at 635 ("Payments must be promptly made, at a time contemporaneous to the illness or injury.") (internal citation omitted).

The conditions of eligibility for SSD benefits, by contrast, are both more—and less—stringent than those required to obtain maintenance. On the one hand, the SSD requirements are more onerous: a claimant must demonstrate that he has suffered a disability for a minimum period of five months, *Gaines v. Amalgamated Ins. Fund*, 753 F.2d 288, 290 (3d Cir.1985); that his disability is permanent, having lasted, or been expected to last, for a continuous period of 12 months, *id.*; 20 C.F.R. § 416.909; and that his impairment precludes performance not only of his former job but also of any work "existing in significant numbers in the national economy," including "basic work activities." *McCrea v. Comm'r of Social Sec.*, 370 F.3d

357, 360 (3d Cir.2004); *see* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520, 416.920.

On the other hand, the conditions of eligibility for SSD benefits are, in certain other respects, *less* burdensome than those required to receive maintenance. Claimants with nonoccupational injuries may recover SSD benefits, 42 U.S.C. § 423(d)(1)(A),[9] and proof of actual expenditure of funds on food, lodging, or other expenses is not necessary to obtain benefits. Further, SSD payments need not be expended on food and lodging, and financial need is not a prerequisite to obtain assistance. *Mazza v. Sec. of Health and Human Servs.*, 903 F.2d 953, 956 (3d Cir. 1990). Further, a Social Security claimant is entitled to benefits, even if his condition is diagnosed as permanent or incurable. 42 U.S.C. § 423(a)(1).

These important differences support classification of maintenance and SSD payments as different, rather than "exact[ly] equivalent," benefits. *Shaw*, 526 F.2d at 201; *see Handelsman*, 307 F.2d at 537 (holding that payments received by sailor under state disability program do not offset amount owed under maintenance duty); *see also Barnes*, 900 F.2d at 637 (upholding seaman's right to maintenance, despite possibility of double recovery from his receipt of disability pensions, overtime and premium pay, and vacation allowances).

Nonetheless, DRBA attempts to analogize SSD payments to Medicare benefits, which at least one court of appeals has concluded may satisfy a shipowner's "cure" obligation. *Moran Towing & Transportation Co. v. Lombas*, 58 F.3d 24, 26–27 (2d Cir.1995). In *Moran*, the Second Circuit Court of Appeals held that a seaman's

receipt of Medicare-funded treatment relieved the shipowner of its duty to provide "cure." The court relied on our pronouncement in *Shaw* that "a vessel owner has no obligation to provide maintenance and cure if it is furnished by others at no expense to the seaman." *Id.* at 27 (quoting *Shaw*, 526 F.2d at 201). Significantly, *Moran* did not analyze a consideration that we identified as critical in determining whether "offset" was appropriate in *Shaw*—whether the payments received are the "exact equivalent" of cure. *Shaw*, 526 F.2d at 201. Because *Moran* omitted an aspect of the offset analysis that we deemed "essential" in *Shaw*, its holding lacks persuasive force.

Even if *Moran* were binding on this Court, *Moran*'s core holding—that Medicare benefits may satisfy a shipowner's "cure" obligation—comports with the reasoning in *Shaw*. There, as discussed, we held that Blue Cross–Blue Shield benefits, which covered all of the seaman's medical expenses during his recovery, provided the "exact equivalent" of "cure." Likewise, the Medicare benefits in *Moran*, which covered the seaman's hospital bills during his convalescence, provided the equivalent of "cure." SSD benefits, by contrast, differ in scope and purpose from maintenance. Hence, *Moran*'s conclusions with respect to Medicare benefits do not govern our analysis of SSD payments made to Kopacz.

Hence, we conclude that Kopacz's receipt of SSD benefits did not relieve DRBA of its maintenance obligation.

### D. Prejudgment Interest

■ Next, DRBA contends that the District Court erred in granting Kopacz

---

**9.** The federal statute defines "disability" as: "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

prejudgment interest on the amount of maintenance owed to him.[10] "The rule in admiralty is that prejudgment interest should be awarded unless there are exceptional circumstances that would make such an award inequitable." *Matter of Bankers Trust Co.*, 658 F.2d 103, 108 (3d Cir.1981); *see Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. Unit A 1980) ("Discretion to deny prejudgment interest is created only when there are 'peculiar circumstances' that would make it inequitable for the losing party to be forced to pay prejudgment interest.") (internal citation omitted). In *Matter of Bankers Trust Co.*, we explained, "Generally, exceptional circumstances exist only when the district court concludes that the party requesting interest has (1) unreasonably delayed in prosecuting its claim, (2) made a bad faith estimate of its damages that precluded settlement, or (3) not sustained any actual damages." 658 F.2d at 108. An award of prejudgment interest, however, must be compensatory rather than punitive, *id.*, and is "left to the sound discretion of the district court," which will be disturbed only for abuse of discretion. *M & O Marine, Inc. v. Marquette Co.*, 730 F.2d 133, 136 (3d Cir.1984); *see Socony Mobil Oil Co. v. Tex. Coastal & Intern.*, 559 F.2d 1008, 1014 (5th Cir.1977); *see also Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 206 (3d Cir.2004) (noting district court's broad discretion to award prejudgment interest). The District Court concluded that an award of prejudgment interest was "appropriate in this instance," citing our statement in *Deisler v. McCormack Aggregates Co.*, that such relief is "merely an element of a plaintiff's complete compensation." 54 F.3d 1074, 1087 (3d Cir.1995).

DRBA does not identify an exceptional circumstance justifying withholding prejudgment interest. Rather, DRBA's sole contention on appeal is that other payments to Kopacz, including LTD benefits and the value of his sick and annual leave, adequately compensated him, and that the award of prejudgment interest was thus punitive. However, we earlier rejected this argument, concluding that other payments made to Kopacz did not satisfy DRBA's maintenance obligation. Having held that Kopacz has a separate and independent right to maintenance, we conclude that the District Court did not abuse its discretion in compensating Kopacz for losses stemming from DRBA's tardy discharge of its duty. *See Matter of Bankers Trust Co.*, 658 F.2d at 108 ("Its [prejudgment interest's] purpose is to reimburse the claimant for the loss of use of its investment or its funds from the time of such loss until judgment is entered."); *Skretvedt*, 372 F.3d at 208 ("As a general rule, prejudgment interest is to be awarded when the amount of the underlying liability is reasonably capable of ascertainment and the relief granted would otherwise fall short of making the claimant whole because he or she has been denied the use of the money which was legally due." (quoting *Anthuis v. Colt Indus. Operating Corp.*, 971 F.2d 999, 1010 (3d Cir. 1992))); *see also Deisler*, 54 F.3d at 1087 ("The Supreme Court has repeatedly held that prejudgment interest is merely an element of a plaintiff's complete compensation.").

### E. Consequential Damages

In his cross-appeal, Kopacz argues that the District Court erred in denying his claim for consequential damages. In *Deisler*, we held that consequential dam-

---

10. Kopacz sought—and was awarded—prejudgment interest from October 2006, when

Hartford ceased payment of LTD benefits, to the date of judgment.

ages arising from a shipowner's failure to provide maintenance and cure, including lost wages and pain and suffering, are generally recoverable. 54 F.3d at 1082–84. To establish an entitlement to such damages, however, a plaintiff must articulate, at minimum, a specific injury, and explain how that injury resulted from the shipowner's breach of its maintenance duty. *Id.* at 1082–83. Kopacz fails both requirements. In fact, Kopacz fails even to identify the kind of consequential damages that he seeks—lost wages, pain and suffering, or other relief. Nor does Kopacz specifically identify an emotional, physical, or economic injury resulting from non-payment of maintenance. To the contrary, Kopacz concedes that all properly documented medical costs were promptly reimbursed, and he does not allege, much less prove, that other payments, including SSD and LTD benefits, were insufficient to cover his basic expenses. Rather, Kopacz merely asserts that he "really needed the money." Appellee's Br. at 26. On this record, we conclude that the District Court did not abuse its discretion in denying Kopacz's claim for lost wages and pain and suffering.

The sole type of consequential damages that Kopacz expressly seeks—attorney's fees and costs—was properly denied by the District Court. Attorney's fees and costs are recoverable solely where a shipowner's refusal to pay maintenance and cure is unreasonable. *See Atlantic Sounding Co., Inc. v. Townsend,* — U.S. —, 129 S.Ct. 2561, 2571, 174 L.Ed.2d 382 (2009) (noting that award of attorney's fees is permissible for shipowner's "callous" and "willful and persistent" refusal to pay maintenance and cure); *Vaughan,* 369 U.S. at 530–31, 82 S.Ct. 997 (noting that attorney's fees are recoverable where shipowner's refusal to pay maintenance stemmed from a "wanton and intentional

disregard" of the legal rights of the seaman); *Deisler,* 54 F.3d at 1087 ("Attorney's fees and costs differ from interest, lost wages and damages for pain and suffering because attorney's fees and costs cannot be recovered unless plaintiff can first establish defendant's bad faith or recalcitrance."). Here, DRBA, providing Kopacz almost $40,000 in wages, sick and annual leave, and long-term disability benefits, did not exhibit the requisite callousness. Further, Kopacz did not seek maintenance until over one year after his date of injury, when Hartford demanded reimbursement for the amount of SSD payments made to him. Although DRBA declined to pay maintenance, its decision, premised on a colorable legal theory, did not reflect a wanton and intentional disregard of Kopacz's rights. *See Deisler,* 54 F.3d at 1087 (requiring proof that denial of maintenance was "arbitrary or capricious" to recover attorney's fees and costs).

Accordingly, we conclude that the District Court properly exercised its discretion to deny Kopacz attorney's fees and costs.

### III. Conclusion

For the foregoing reasons, we will AFFIRM the judgment of the District Court.

ALARCÓN, Circuit Judge, dissenting:

I respectfully dissent from the majority's opinion in this matter. The question presented for our review is whether a person who resides on shore and commutes to his or her job as a day laborer aboard a ferry is entitled to compensation for lodging and food, if he or she becomes incapacitated, in addition to receiving long-term disability benefits paid for by his or her employer that fully cover his living expenses.

In concluding that Mr. Kopacz is entitled to an additional payment for the cost

of his lodging and meals, the majority, citing this Court's decision in *Barnes v. Andover Co., L.P.,* 900 F.2d 630 (3rd Cir. 1990), states as follows: "Although *Barnes* acknowledged that there was 'some logic' in denying maintenance to shore-based seamen, the court stressed that the 'life of the law' is 'experience,' not 'logic.'" Majority Op. at 627. In a subsequent passage, the majority states: "*Barnes* strongly suggested that commuter seamen are also entitled to maintenance." Majority Op. at 628. I disagree with this reading of *Barnes.* In fact this Court *expressly declined* to reach this question in *Barnes.* Instead, this Court stated:

> Whatever the merits of the double recovery objection for maintenance paid to land-based seamen, that argument is inapplicable to Barnes. Barnes was not *shorebound and Andover does not suggest that his wages were fixed in contemplation of his providing his own food and lodging.* Thus, the fact that Barnes chose to use his wages to maintain an on-shore residence rather than on entertainment or on some frivolity should not be used to reduce his recovery, *particularly since there is no question here of any double recovery as a result of land-based wages.*

*Id.* at 643 (emphasis added).

Moreover, the fact that "DRBA cites no authority supporting withholding maintenance from commuter seamen," Majority Op. at 628, does not logically support a conclusion that a commuter seaman is therefore *entitled* to maintenance without some showing that the equities favor this result. I cannot join the majority's number because I am persuaded that extending the maritime doctrine of maintenance to an employee who commutes each day from his shore-based home to his job as a day laborer on a ferry boat is contrary to both logic and experience.

## I

As noted in *Barnes,* this Circuit has not yet determined whether the doctrine of maintenance applicable to seamen who are incapacitated while on ships that sail to distant ports should be extended to commuter seamen.

In his brilliant Harvard Law School lectures, Justice Oliver Wendell Holmes explained the evolution of Common Law principles as follows:

> The object of this book is to present a general view of the Common Law. To accomplish the task, other tools are needed besides logic. It is something to show that the consistency of a system requires a particular result, but it is not all. The life of the law has not been logic: it has been experience. The felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with their fellow-men, have had a good deal more to do than the syllogism in determining the rules by which men should be governed. The law embodies the story of a nation's development through many centuries, and it cannot be dealt with as if it contained only the axioms and corollaries of a book of mathematics. In order to know what it is, we must know what it has been, and what it tends to become. We must alternately consult history and existing theories of legislation. But the most difficult labor will be to understand the combination of the two into new products at every stage. The substance of the law at any given time pretty nearly corresponds, so far as it goes, with what is then understood to be convenient; but its form and machinery, and the degree to which it is able to work out desired results, depend very much upon its past.

Oliver Wendell Holmes, Jr., *The Common Law* 3–4, (John Harvard Library ed., Belknap Press of Harvard Univ. Press 2009) (1881).

The woeful experience suffered by seamen incapacitated on lengthy voyages to distant ports that led to the adoption of the maintenance doctrine was vividly described by Justice Story in 1823 in *Harden v. Gordon*, 11 F. Cas. 480 (C.C.D.Me.1823) (No. 6,047).

> Seamen are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and exhausting labor. They are generally poor and friendless, and acquire habits of gross indulgence, carelessness, and improvidence. If some provision be not made for them in sickness at the expense of the ship, they must often in foreign ports suffer the accumulated evils of disease, and poverty, and sometimes perish from the want of suitable nourishment. Their common earnings in many instances are wholly inadequate to provide for the expenses of sickness; and if liable to be so applied, the great motives for good behavior might be ordinarily taken away by pledging their future as well as past wages for the redemption of the debt. In many voyages, particularly those to the West Indies, the whole wages are often insufficient to meet the expenses occasioned by the perilous diseases of those insalubrious climates. On the other hand, if these expenses are a charge upon the ship, the interest of the owner will be immediately connected with that of the seamen. The master will watch over their health with vigilance and fidelity. He will take the best methods, as well to prevent diseases, as to ensure a speedy recovery from them. He will never be tempted to abandon the sick to their forlorn fate; but his duty, combining with the interest

of his owner, will lead him to succor their distress, and shed a cheering kindness over the anxious hours of suffering and despondency.

*Id.* at 483. Justice Story's opinion in *Harden* was written in his capacity as the Circuit Justice for the District of Maine.

In 1903, the United States Supreme Court referred to Justice Story's decision in *Harden* as the first case in this country that adopted the doctrine of maintenance and cure. *The Osceola*, 189 U.S. 158, 172, 23 S.Ct. 483, 47 L.Ed. 760 (1903). The Court summarized Justice Story's opinion as follows:

> Justice Story held that a claim for the expenses of cure in case of sickness constituted in contemplation of law a part of the contract for wages, over which admiralty had a rightful jurisdiction. The action was *in personam* against the master and owner for wages and other expenses occasioned by the sickness of the plaintiff *in a foreign port in the course of the voyage,* which were allowed.

*Id.* (emphasis added). The Court held in *The Osceola* that, upon reviewing English and American authorities, the law

> may be considered as settled upon the following proposition[ ]: ... "[t]hat the vessel and her owners are liable, in case a seamen falls sick or is wounded in the service of his ship, to the extent of his maintenance and cure, and to his wages, at least as long as the voyage is continued.

*Id.* at 175, 23 S.Ct. 483. The Court also held "[t]hat the seaman is not allowed to recover an indemnity for the negligence of the master, or any member of the crew, but is entitled to maintenance and cure, whether the injuries were received by neg-

ligence or accident." *Id.*[11]

In each of the cases in which the Supreme Court has applied Justice Story's analysis of the experiences of seamen that support application of the doctrine of maintenance and cure, the facts demonstrate that the seaman was incapacitated while he served as a member of a vessel traveling to distant ports. In *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993 (1938), the Court defined the terms "maintenance" and "cure" as follows: "The maintenance exacted is comparable to that to which the seaman is entitled to while at sea and 'cure' is care, including nursing and medical attention, during such period as the duty continues." *Id.* at 528, 58 S.Ct. 651 (internal citations omitted).

In *Aguilar v. Standard Oil Co. of New Jersey*, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943), the injured seaman was a messman on a steamship engaged in coastwise trade between New Orleans and East Coast and Gulf Coast ports. While the vessel was moored in a port in Philadelphia, the seaman was injured as he left the ship on shore leave. *Id.* at 725, 63 S.Ct. 930. In a consolidated companion case, a seaman on shore leave was injured as he walked back to his ship by the driver of a motor vehicle not owned, operated or controlled by the ship owner. *Id.* at 725–26, 63 S.Ct. 930.

Citing Justice Story's decision in *Harden*, the Court in *Aguilar* explained its holding that the seamen were entitled to cure and maintenance as follows:

From the earliest times, maritime nations have recognized that unique hazards, emphasized by unusual tenure and control, attend the work of seamen. The physical risks created by natural elements, and the limitations of human adaptability to work at sea, enlarge the narrower and more strictly occupational hazards of sailing and operating vessels. And the restrictions which accompany living aboard a ship for long periods at a time combine with the constant shuttling between unfamiliar ports to deprive the seaman of the comforts and opportunities for leisure, essential for living and working, that accompany most land occupations. Furthermore, the seaman's unusual subjection to authority adds the weight of what would be involuntary servitude for others to these extraordinary hazards and limitations of ship life.

Accordingly, with the combined object of encouraging marine commerce and assuring the well-being of seamen, maritime nations uniformly have imposed broad responsibilities for their health and safety upon the owners of ships. In this country these notions were reflected early, and have since been expanded, in legislation designed to secure the comfort and health of seamen aboard ship, hospitalization at home and care abroad. The statutes are uniform in evincing solicitude that the seamen shall have at hand the barest essentials for existence. They do this in two ways. One is by recognizing the shipowner's duty to supply them, and the other by providing for care at public expense. The former do

---

**11.** In 1920, Congress enacted the Jones Act. Its current text provides as follows:

A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulat-

ing recovery for a personal injury to, or death of, a railway employee apply to an action under this section.

46 U.S.C. § 30104. Thus, under the Jones Act, a seaman can now recover for lost wages and compensation for medical expenses in a civil action against his or her employer.

not create the duty. That existed long before the statutes were adopted. They merely recognize the preexisting obligation and put specific legal sanctions, generally criminal, behind it.

*Id.* at 727–29, 63 S.Ct. 930 (footnotes omitted).

In *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), the plaintiff served as a seaman on the respondent's vessel from November 26, 1956 to March 2, 1957. He was discharged on the termination of a voyage. On March 2, 1957, the ship's master furnished the seaman with a certificate to enter a United States Health Services Hospital. He was examined five days later at the hospital. He was admitted as a patient on March 18, 1957 and treated for tuberculosis. He was discharged to an outpatient status on June 6, 1957. He continued to receive treatment in that status for over two years. *Id.* at 528, 82 S.Ct. 997.

The ship owner declined to provide the seaman with maintenance because he "never complained of any illness during his four months' service." *Id.* The seaman hired a lawyer to enforce his right to maintenance. He also requested an award of attorney's fees. The District Court denied his request for the payment of his attorney's fees. The Court of Appeals affirmed the denial of attorney's fees and held that the amount he earned as a taxi driver had to be deducted from the amount he was entitled to for maintenance and cure. *Id.* at 529, 82 S.Ct. 997.

Relying on its decision in *Calmar S.S. Corp. v. Taylor,* and Justice Story's opinion in *Harden,* the Supreme Court held in *Vaughan* that "[i]t is difficult to imagine a clearer case of damages suffered for the failure to pay maintenance than this one." *Id.* at 531, 82 S.Ct. 997.

The Supreme Court has not extended the maritime doctrine of maintenance and cure to persons who commute to work aboard vessels that do not sail to distant ports. Instead, the Court has continued to adhere to Justice Story's explanation of the policy underlying that duty in *Harden.* For example, in *Vaughan,* the Court stated:

> *The reasons underlying the rule, to which reference must be made in defining it, are those enumerated in the classic passage by Mr. Justice Story in Harden v. Gordon, Fed. Cas. No. 6047 (C. C.):* the protection of seamen, who, as a class, are poor, friendless and improvident, from hazards of illness and abandonment while ill in foreign ports; the inducement to masters and owners to protect the safety and health of seamen while in service; the maintenance of a merchant marine for the commercial service and maritime defense of the nation by inducing men to accept employment in an arduous and perilous service.

369 U.S. at 531, 82 S.Ct. 997 (quoting *Calmar S.S. Corp. v. Taylor,* 303 U.S. at 528, 58 S.Ct. 651) (emphasis added).

The undisputed facts in this matter demonstrate that Mr. Kopacz was employed by the DRBA as a deckhand on its ferries. It was his day job. He commuted from his home. He did not receive lodging or meals from his employer. He reported an on-the-job injury on December 24, 2004. He was found to be unfit for duty on DRBA's ferries on January 5, 2005.

Mr. Kopacz received benefits through a long-term disability policy paid for by his employer which provided for the payment of his full wages for the first ninety days of his disability, and 60% of his wages thereafter so that he would continue to be provided an income in the event his ability to earn a living was interrupted or terminated by prolonged disability.

Mr. Kopacz received his full pay for ninety days. Thereafter he was paid $2,192 per month. The parties stipulated that his monthly living expenses totaled $2,190 per month.

Mr. Kopacz applied for Social Security Administration ("SSA") disability payments. SSA approved his application in October of 2006. SSA sent him a check in the amount of $17,142 which represented his benefits retroactive to July 5, 2005.

Thereafter, Mr. Kopacz received SSA benefits of $1,167 monthly. The DRBA's long-term disability benefits policy provided that SSA benefits are an off-set to those provided by the policy. Hartford, the long-term disability insurer, requested that Mr. Kopacz repay the overpayment of $16,607.92 which arose when Mr. Kopacz was awarded SSA payments retroactively. Mr. Kopacz refused. He insisted that DRBA repay the Hartford $16,607.92 and the $1,100 per month that Hartford was deducting.

DRBA filed this action in the District Court seeking a declaration that it had fully met its obligations to Mr. Kopacz. The District Court concluded that DRBA was required to make payments to Mr. Kopacz for his maintenance to cover the cost of his lodging and food, notwithstanding the fact that DRBA had provided monthly living expenses benefits through a long-term disability policy.

The foregoing facts do not meet the requirements for the application of the doctrine of maintenance set forth in *Harden* and adopted by the Supreme Court in *The Osceola*. As the Court instructed in *Vaughan*, the "reasons underlying the rule to which reference must be made in defining" the doctrine of maintenance are those enumerated by Justice Story in *Harden*. *Vaughan*, 369 U.S. at 531, 82 S.Ct. 997. In awarding maintenance in this matter, the District Court failed to set forth the experiences encountered by a commuter seamen that define his or her entitlement to maintenance.

There is no evidence in the record that Mr. Kopacz is a poor, friendless, and improvident person. He was not subjected to the perilous hazards and sudden illnesses that can be incurred from the change of climate while sailing on the high seas. He was not subject to being abandoned in a distant port—without wages, or the means of providing for his own maintenance. Therefore, he clearly did not qualify for maintenance.

In extending the doctrine of maintenance and cure to day laborers who work on ferries and who do not face the hazards described by Justice Story, the District Court ignored Justice Holmes's admonition that we must look to real-life experience in creating new rules of law. The fact that the Supreme Court has categorized seamen as "wards" of admiralty does not justify an extension of the maintenance doctrine to seamen who commute to work each day, and in addition, receive benefits through disability insurance and social security that were unavailable to Justice Story's hapless seamen who depended on their masters to provide their lodging, food, and medical care. In my view, an award of maintenance under these circumstances clearly results in an impermissible double recovery for Mr. Kopacz.

## II

Perhaps an even stronger argument that an award of maintenance and cure does not apply to a commuter seaman who does not sail to distant ports, and does not receive lodging and food aboard his employer's ferry boats, is that such a rule is contrary to the Shipowners' Liability (Sick and Injured Seamen) Convention. *See* Convention Between the United States of

America and Other Members of the International Labor Organization Respecting Shipowners' Liability in Case of Sickness, Injury, or Death of Seamen, October 24, 1936, 54 Stat. 1693, 40 U.N.T.S. 169, attached hereto. The Shipowners' Liability Convention, proclaimed by the President on September 29, 1939, provides in section 1 of Article 4 that: "The ship owner shall be liable to defray the expense of medical care and maintenance until the sick or injured person has been cured, or until the sickness or incapacity has been declared of a permanent character." 54 Stat. 1693, art. 4, § 1.

In section 3 of Article 4, the Convention also provides that:

if there is in force in the territory in which the vessel is registered a scheme applying to seamen of compulsory sickness insurance, compulsory accident insurance or workmen's compensation for accidents, national laws may provide—

(a) that a shipowner shall cease to be liable in respect of a sick or injured person from the time at which that person becomes entitled to medical benefits under the insurance or compensation scheme.

*Id.* at art. 4, § 3. The United States of America adopted the Convention subject to the understanding that "the United States understands and construes the words 'maritime navigation' appearing in this Convention to mean navigation on the high seas only." *Id.* at 1704, U.S. ratification subject to understandings.

The Senate of the United States gave its consent on June 13, 1938 to the ratification of the Convention by the President of the United States. President Franklin D. Roosevelt declared on September 29, 1939 that he "caused the said convention to be made public to the end that the same and every article and clause thereof may be observed and fulfilled in good faith by the United States of America and the citizens thereof ... subject to understandings above recited...." *Id.* at Final Proclamation.

Extending the doctrine of maintenance and cure to commuter seamen, as adopted by the United States in ratifying the Convention, is in direct conflict with its limitation to seamen incapacitated on voyages on the high seas.

**Conclusion**

The Supreme Court's decision in *The Osceola* limited the application of the doctrine of maintenance and cure to seamen incapacitated during voyages to distant ports where the record shows the following facts:

One. Because of the length of the voyage, the shipowner has provided the seaman with lodging and food.

Two. The shipowner has ceased paying wages to the seaman because of his unfitness for duty.

Three. The shipowner has failed to compensate the seaman for his food or lodging, for which he is unable to work because of his injury.

Four. The shipowner has failed to pay for the seaman's medical care and hospitalization.

Five. The seaman has been abandoned in a foreign port without funds to pay for his medical treatment and transportation to his home.

Mr. Kopacz has not been subjected to any of these deprivations. His ferry boat did not sail to distant ports on the high seas. Because he commuted to his work assignment each day from his home, he did not eat or sleep aboard the shipowner's ferryboats. He was not abandoned in a distant port without compensation for his living expenses and medical care. The shipowner paid for disability insurance

that was sufficient to cover his monthly living expenses.

I am sure Justice Story would be astonished to learn that a commuter seaman, whose monthly living expenses were provided for by his shipowner, must also be furnished additional funds to pay for lodging and food that he was not entitled to receive during his eight-hour shift, *solely* because he is a ward of admiralty.

While I am not sure Justice Holmes had the doctrine of maintenance and cure in mind when he instructed us that experience plays a dominant role in the evolution of the Common Law, I doubt seriously that he would have concluded that the relatively bland experience of a commuter seaman, as compared to one whose work takes him or her to distant parts on the high seas, would justify an extension of the doctrine of maintenance to seamen who do not encounter the conditions described in the Supreme Court's decision in *The Osceola.*

It is also troubling that an award of maintenance to a commuter seaman is contrary to a Convention that the United States has entered into with other maritime nations. In relying on the absence of authority supporting the withholding of maintenance from commuter seamen to reach its conclusion that such seamen are therefore entitled to maintenance, Majority Op. at 11, the majority has failed to set forth the "reasons underlying the rule to which reference must be made in defining" the doctrine of maintenance as enumerated by Justice Story in *Harden. Vaughan,* 369 U.S. at 531, 82 S.Ct. 997. Until the Supreme Court addresses this novel question, I believe the lower federal courts must faithfully comply with the limited reach of the maintenance rule announced by the Supreme Court in *The Osceola* as the supreme law of the land.

Accordingly, I would reverse the double recovery awarded to Mr. Kopacz in the District Court's judgment.

## ATTACHMENT

**Convention Between the United States of America and Other Members of the International Labor Organization Respecting Shipowners' Liability in Case of Sickness, Injury, or Death of Seamen, October 24, 1936, 54 Stat. 1693, 40 U.N.T.S. 169**

*Convention between the United States of America and other members of the International Labor Organization respecting shipowners' liability in case of sickness, injury, or death of seamen. Adopted by the General Conference of the International Labor Organization, twenty-first session, Geneva, October 24, 1936; ratification advised by the Senate of the United States, subject to understandings, June 13, 1938; ratified by the President of the United States, subject to the said understandings, August 15, 1938; ratification of the United States of America registered with the Secretary-General of the League of Nations October 29, 1938; proclaimed by the President of the United States September 29, 1939.*

October 24, 1936<br>[T. S. No. 951]

### By the President of the United States of America

## A PROCLAMATION

Whereas a draft convention (No. 55) with regard to the liability of the shipowner in case of sickness, injury, or death of seamen, was adopted on the twenty-fourth day of October nineteen hundred and thirty-six, by the General Conference of the International Labor Organization at its twenty-first session held at Geneva October 6–24, 1936, a certified copy of which draft convention, communicated by the Secretary-General of the League of Nations, acting in conformity with the requirements in the nineteenth Article of the Constitution of the International Labor Organization, to the Government of the United States of America as a Member of the said Organization, is, in the French and English languages, word for word as follows:

*Shipowners' Liability (Sick and Injured Seamen) Convention, 1936. Preamble.*

La Conférence générale de l'Organisation internationale du Travail,

Convoquée à Genève par le Conseil d'administration du Bureau international du Travail, et s'y étant réunie le 6 octobre 1936 en sa vingt et unième session,

Après avoir décidé d'adopter diverses propositions relatives aux obligations de l'armateur en cas de maladie, d'accident ou de décès des gens de mer, question qui est comprise dans le deuxième point à l'ordre du jour de la session,

Après avoir décidé que ces propositions prendraient la forme d'un projet de convention internationale,

The General Conference of the International Labour Organisation,

*General Conference, International Labor Organization.*

Having been convened at Geneva by the Governing Body of the International Labour Office, and having met in its Twenty-first Session on 6 October 1936, and

Having decided upon the adoption of certain proposals with regard to the liability of the shipowner in case of sickness, injury or death of seamen, which is included in the second item on the Agenda of the Session, and

Having determined that these proposals shall take the form of a Draft International Convention,

**Adoption of Draft Convention.**

adopte, ce vingt-quatrième jour d'octobre mil neuf cent trente-six, le projet de convention ci-après qui sera dénommé Convention sur les obligations de l'armateur en cas de maladie ou d'accident des gens de mer, 1936:

adopts, this twenty-fourth day of October of the year one thousand nine hundred and thirty-six, the following Draft Convention which may be cited as the Shipowners' Liability (Sick and Injured Seamen) Convention, 1936:

### ARTICLE 1.

### ARTICLE 1.

**Application.**

1. La présente convention s'applique à toute personne employée à bord d'un navire, autre qu'un navire de guerre, immatriculé dans un territoire pour lequel la présente convention est en vigueur et qui effectue habituellement une navigation maritime.

1. This Convention applies to all persons employed on board any vessel, other than a ship of war, registered in a territory for which this Convention is in force and ordinarily engaged in maritime navigation.

**Exceptions by national law or regulation permitted.**

2. Toutefois, tout Membre de l'Organisation internationale du Travail pourra prévoir dans sa législation nationale telles exceptions qu'il estimerait nécessaires en ce qui concerne:

2. Provided that any Member of the International Labour Organisation may in its national laws or regulations make such exceptions as it deems necessary in respect of—

a) les personnes employées à bord:
 i) des navires appartenant à une autorité publique lorsque ces navires n'ont pas une affectation commerciale;
 ii) des bateaux de pêche côtière;
 iii) des bateaux d'une jauge brute inférieure à vingt-cinq tonneaux;
 iv) des bateaux en bois de construction primitive, tels que des "dhows" et jonques;
b) les personnes employées à bord pour le compte d'un employeur autre que l'armateur;
c) les personnes employées, exclusivement dans les ports, à la réparation, au nettoyage, au chargement ou au déchargement des navires;
d) les membres de la famille de l'armateur;
e) les pilotes.

(a) persons employed on board,
 (i) vessels of public authorities when such vessels are not engaged in trade;
 (ii) coastwise fishing boats;
 (iii) boats of less than twenty-five tons gross tonnage;
 (iv) wooden ships of primitive build such as dhows and junks;
(b) persons employed on board by an employer other than the shipowner;
(c) persons employed solely in ports in repairing, cleaning, loading or unloading vessels;
(d) members of the shipowner's family;
(e) pilots.

## Article 2.

1. Les obligations de l'armateur doivent couvrir les risques:

a) de maladie ou d'accident survenus entre la date stipulée dans le contrat d'engagement pour le commencement du service et l'expiration de l'engagement;

b) de décès résultant d'une telle maladie ou d'un tel accident.

2. Toutefois, la législation nationale peut prévoir des exceptions:

a) pour l'accident qui n'est pas survenu au service du navire;

b) pour l'accident ou la maladie imputable à un acte intentionnel ou à une faute intentionnelle ou à l'inconduite du malade, du blessé ou du décédé;

c) pour la maladie ou l'infirmité dissimulée volontairement au moment de l'engagement.

3. La législation nationale peut prévoir que les obligations de l'armateur ne s'appliqueront pas en ce qui concerne la maladie, ni en ce qui concerne le décès imputable directement à la maladie, lorsque la personne employée a refusé de se soumettre à un examen médical au moment de l'engagement.

## Article 3.

Aux fins de la présente convention l'assistance à la charge de l'armateur comprend:

a) le traitement médical et la fourniture des médicaments et autres moyens thérapeutiques de qualité et quantité suffisantes;

b) la nourriture et le logement.

## Article 2.

1. The shipowner shall be liable in respect of— [*Liability of shipowner.*]

(a) sickness and injury occurring between the date specified in the articles of agreement for reporting for duty and the termination of the engagement; [*Sickness and injury during term of employment.*]

(b) death resulting from such sickness or injury. [*Resultant death.*]

2. Provided that national laws or regulations may make exceptions in respect of: [*Exceptions by national law or regulation permitted.*]

(a) injury incurred otherwise than in the service of the ship;

(b) injury or sickness due to the wilful act, default or misbehaviour of the sick, injured or deceased person;

(c) sickness or infirmity intentionally concealed when the engagement is entered into.

3. National laws or regulations may provide that the shipowner shall not be liable in respect of sickness, or death directly attributable to sickness, if at the time of the engagement the person employed refused to be medically examined. [*Refusal to be medically examined.*]

## Article 3.

For the purpose of this Convention, medical care and maintenance at the expense of the shipowner comprises: [*Medical care and maintenance, scope.*]

(a) medical treatment and the supply of proper and sufficient medicines and therapeutical appliances; and

(b) board and lodging.

ARTICLE 4.

*Period of liability.*

1. L'assistance doit être à la charge de l'armateur jusqu'à guérison du malade ou du blessé, ou jusqu'à constatation du caractère permanent de la maladie ou de l'incapacité.

*Limitation permitted.*

2. Toutefois, la législation nationale peut prévoir que l'assistance à la charge de l'armateur sera limitée à une période qui ne pourra être inférieure à seize semaines à partir du jour de l'accident ou du début de la maladie.

*Provisions where compulsory sickness insurance, etc., is in force.*

3. En outre, s'il existe un système d'assurance-maladie obligatoire, un système d'assurance-accidents obligatoire ou un système de réparation des accidents du travail, qui soit en vigueur pour les marins dans le territoire où le navire est immatriculé, la législation nationale peut prévoir:

a) que l'armateur cessera d'être responsable à l'égard d'une personne malade ou blessée à partir du moment où cette personne a droit à l'assistance médicale en vertu du système d'assurance ou de réparation;

b) que l'armateur cessera d'être responsable, à partir du moment prescrit par la loi pour l'octroi de l'assistance médicale en vertu du système d'assurance ou de réparation aux bénéficiaires dudit système, même lorsque la personne malade ou blessée n'est pas elle-même couverte par ce système, à la condition qu'elle n'en soit pas exclue en raison de toute restriction visant particulièrement les

ARTICLE 4.

1. The shipowner shall be liable to defray the expense of medical care and maintenance until the sick or injured person has been cured, or until the sickness or incapacity has been declared of a permanent character.

2. Provided that national laws or regulations may limit the liability of the shipowner to defray the expense of medical care and maintenance to a period which shall not be less than sixteen weeks from the day of the injury or the commencement of the sickness.

3. Provided also that, if there is in force in the territory in which the vessel is registered a scheme applying to seamen of compulsory sickness insurance, compulsory accident insurance or workmen's compensation for accidents, national laws or regulations may provide—

(a) that a shipowner shall cease to be liable in respect of a sick or injured person from the time at which that person becomes entitled to medical benefits under the insurance or compensation scheme;

(b) that the shipowner shall cease to be liable from the time prescribed by law for the grant of medical benefits under the insurance or compensation scheme to the beneficiaries of such schemes, even when the sick or injured person is not covered by the scheme in question, unless he is excluded from the scheme by reason of any restriction which affects particularly foreign workers or workers not

travailleurs étrangers ou les travailleurs ne résidant pas sur le territoire où le navire est immatriculé.

resident in the territory in which the vessel is registered.

### Article 5.

1. Lorsque la maladie ou l'accident entraîne une incapacité de travail, l'armateur doit payer:

a) tant que le malade ou le blessé demeure à bord, la totalité du salaire;

b) à partir du débarquement, si le malade ou le blessé a des charges de famille, la totalité ou une partie du salaire selon les prescriptions de la législation nationale, jusqu'à guérison ou jusqu'à constatation du caractère permanent de la maladie ou de l'incapacité.

2. Toutefois, la législation nationale peut limiter la responsabilité de l'armateur quant au paiement de la totalité ou d'une partie du salaire à une personne débarquée à une période qui ne pourra être inférieure à seize semaines à partir du jour de l'accident ou du début de la maladie.

3. En outre, s'il existe un système d'assurance-maladie obligatoire, un système d'assurance-accidents obligatoire ou un système de réparation des accidents du travail qui soit en vigueur pour les marins dans le territoire où le navire est immatriculé, la législation nationale peut prévoir:

a) que l'armateur cessera d'être responsable à l'égard d'une personne malade ou blessée à partir du moment où cette personne a droit aux prestations en espèces en vertu du système d'assurance ou de réparation;

### Article 5.

1. Where the sickness or injury results in incapacity for work the shipowner shall be liable—

*Incapacity for work.*

(a) to pay full wages as long as the sick or injured person remains on board;

(b) if the sick or injured person has dependants, to pay wages in whole or in part as prescribed by national laws or regulations from the time when he is landed until he has been cured or the sickness or incapacity has been declared of a permanent character.

2. Provided that national laws or regulations may limit the liability of the shipowner to pay wages in whole or in part in respect of a person no longer on board to a period which shall not be less than sixteen weeks from the day of the injury or the commencement of the sickness.

*Limitation permitted.*

3. Provided also that, if there is in force in the territory in which the vessel is registered a scheme applying to seamen of compulsory sickness insurance, compulsory accident insurance or workmen's compensation for accidents, national laws or regulations may provide:

*Provisions where compulsory sickness insurance, etc., is in force.*

(a) that a shipowner shall cease to be liable in respect of a sick or injured person from the time at which that person becomes entitled to cash benefits under the insurance or compensation scheme;

b) que l'armateur cessera d'être responsable, à partir du moment prescrit par la loi pour l'octroi des prestations en espèces en vertu du système d'assurance ou de réparation aux bénéficiaires dudit système, même lorsque la personne malade ou blessée n'est pas elle-même couverte par ce système, à la condition qu'elle n'en soit pas exclue en raison de toute restriction visant particulièrement les travailleurs étrangers ou les travailleurs ne résidant pas sur le territoire où le navire est immatriculé.

b) that the shipowner shall cease to be liable from the time prescribed by law for the grant of cash benefits under the insurance or compensation scheme to the beneficiaries of such schemes, even when the sick or injured person is not covered by the scheme in question, unless he is excluded from the scheme by reason of any restriction which affects particularly foreign workers or workers not resident in the territory in which the vessel is registered.

ARTICLE 6.

ARTICLE 6.

*Expense of repatriation.*

1. L'armateur doit supporter les frais de rapatriement de tout malade ou blessé débarqué en cours de route par suite d'une maladie ou d'un accident.

1. The shipowner shall be liable to defray the expense of repatriating every sick or injured person who is landed during the voyage in consequence of sickness or injury.

*Port to which return is effected.*

2. Le port de rapatriement doit être:

2. The port to which the sick or injured person is to be returned shall be—

a) ou le port d'engagement;

(a) the port at which he was engaged; or

b) ou le port de départ du navire;

(b) the port at which the voyage commenced; or

c) ou un port du pays du malade ou du blessé ou du pays dont relève le malade ou le blessé;

(c) a port in his own country or the country to which he belongs; or

d) ou un autre port fixé par accord entre l'intéressé et le capitaine ou l'armateur, avec l'approbation de l'autorité compétente.

(d) another port agreed upon by him and the master or shipowner, with the approval of the competent authority.

*Charges included in expense of repatriation.*

3. Les frais de rapatriement doivent comprendre toutes dépenses relatives au transport, au logement et à la nourriture du malade ou du blessé pendant le voyage, ainsi que les frais d'entretien du malade ou du blessé jusqu'au moment fixé pour son départ.

3. The expense of repatriation shall include all charges for the transportation, accommodation and food of the sick or injured person during the journey and his maintenance up to the time fixed for this departure.

4. Si le malade ou le blessé est en état de travailler, l'armateur peut s'acquitter de la prestation de rapatriement à sa charge en lui procurant un emploi convenable à bord d'un navire se rendant à l'une des destinations prévues au paragraphe 2 du présent article.

4. If the sick or injured person is capable of work, the shipowner may discharge his liability to repatriate him by providing him with suitable employment on board a vessel proceeding to one of the destinations mentioned in paragraph 2 of this Article.

*Person capable of work.*

## ARTICLE 7.

## ARTICLE 7.

1. L'armateur doit supporter les frais funéraires en cas de décès survenu à bord, ou en cas de décès survenu à terre lorsqu'au moment de sa mort le décédé aurait pu prétendre à l'assistance à la charge de l'armateur.

1. The shipowner shall be liable to defray burial expenses in case of death occurring on board, or in case of death occurring on shore if at the time of his death the deceased person was entitled to medical care and maintenance at the shipowner's expense.

*Burial expenses.*

2. La législation nationale peut prévoir le remboursement, par une institution d'assurance, des frais supportés par l'armateur, lorsque le système d'assurance sociale ou de réparation comporte une prestation pour frais funéraires.

2. National laws or regulations may provide that burial expenses paid by the shipowner shall be reimbursed by an insurance institution in cases in which funeral benefit is payable in respect of the deceased person under laws or regulations relating to social insurance or workmen's compensation.

*Reimbursement by insurance institution.*

## ARTICLE 8.

## ARTICLE 8.

La législation nationale doit exiger de l'armateur ou de son représentant qu'il prenne des mesures afin de sauvegarder les biens laissés à bord par le malade, le blessé ou le décédé visé par la présente convention.

National laws or regulations shall require the shipowner or his representative to take measures for safeguarding property left on board by sick, injured or deceased persons to whom this Convention applies.

*Safeguarding of personal property.*

## ARTICLE 9.

## ARTICLE 9.

La législation nationale doit prévoir des dispositions en vue d'assurer une solution rapide et peu coûteuse des litiges auxquels peuvent donner lieu les obligations de l'armateur en vertu de la présente convention.

National laws or regulations shall make provision for securing the rapid and inexpensive settlement of disputes concerning the liability of the shipowner under this Convention.

*Settlement of disputes.*

## ARTICLE 10.

## ARTICLE 10.

L'armateur peut être exempté des obligations stipulées aux ar-

The shipowner may be exempted from liability under Ar-

*Exemption from certain liability.*

ticles 4, 6 et 7 de la présente convention dans la mesure où ces obligations seraient assumées par les pouvoirs publics.

ticles 4, 6 and 7 of this Convention in so far as such liability is assumed by the public authorities.

### ARTICLE 11.

**Equality of treatment.**

La présente convention ainsi que les législations nationales, en ce qui concerne les prestations dues en vertu de la présente convention, doivent être interprétées et appliquées de manière à assurer l'égalité de traitement à tous les marins, sans distinction de nationalité, de résidence ou de race.

### ARTICLE 11.

This Convention and national laws or regulations relating to benefits under this Convention shall be so interpreted and enforced as to ensure equality of treatment to all seamen irrespective of nationality, domicile or race.

### ARTICLE 12.

**More favorable agreements, etc., not affected.**

Rien dans la présente convention n'affecte toute loi, toute sentence, toute coutume ou tout accord entre les armateurs et les marins qui assure des conditions plus favorables que celles prévues par la présente convention.

### ARTICLE 12.

Nothing in this Convention shall affect any law, award, custom or agreement between shipowners and seamen which ensures more favourable conditions than those provided by this Convention.

### ARTICLE 13.

**Declarations respecting certain territories.**

1. En ce qui concerne les territoires mentionnés par l'article 35 de la Constitution de l'Organisation internationale du Travail, tout Membre de l'Organisation qui ratifie la présente convention doit accompagner sa ratification d'une déclaration faisant connaître:

a) les territoires pour lesquels il s'engage à appliquer sans modifications les dispositions de la convention;

b) les territoires pour lesquels il s'engage à appliquer les dispositions de la convention avec des modifications, et en quoi consistent lesdites modifications;

c) les territoires pour lesquels la convention est inapplicable

### ARTICLE 13.

1. In respect of the territories referred to in Article 35 of the Constitution of the International Labour Organisation, each Member of the Organisation which ratifies this Convention shall append to its ratification a declaration stating:

(a) the territories in respect of which it undertakes to apply the provisions of the Convention without modification;

(b) the territories in respect of which it undertakes to apply the provisions of the Convention subject to modifications, together with details of the said modifications;

(c) the territories in respect of which the Convention is in-

et, dans ces cas, les raisons pour lesquelles elle est inapplicable;

d) les territoires pour lesquels il réserve sa décision.

2. Les engagements mentionnés aux alinéas a) et b) du premier paragraphe du présent article seront réputés partie intégrante de la ratification et porteront des effets identiques.

3. Tout Membre pourra renoncer par une nouvelle déclaration à tout ou partie des réserves contenues dans sa déclaration antérieure en vertu des alinéas b), c) ou d) du paragraphe premier du présent article.

### Article 14.

Les ratifications officielles de la présente convention seront communiquées au Secrétaire général de la Société des Nations et par lui enregistrées.

### Article 15.

1. La présente convention ne liera que les Membres de l'Organisation internationale du Travail dont la ratification aura été enregistrée par le Secrétaire général.

2. Elle entrera en vigueur douze mois après que les ratifications de deux Membres auront été enregistrées par le Secrétaire général.

3. Par la suite, cette convention entrera en vigueur pour chaque Membre douze mois après la date où sa ratification aura été enregistrée.

### Article 16.

Aussitôt que les ratifications de deux Membres de l'Organisation internationale du Travail auront

---

applicable and in such cases the grounds on which it is inapplicable;

(d) the territories in respect of which it reserves its decision.

2. The undertakings referred to in sub-paragraphs (a) and (b) of paragraph 1 of this Article shall be deemed to be an integral part of the ratification and shall have the force of ratification. *(Declarations to be integral parts of ratifications.)*

3. Any Member may by a subsequent declaration cancel in whole or in part any reservations made in its original declaration in virtue of sub-paragraphs (b), (c) or (d) of paragraph 1 of this Article. *(Subsequent cancellation of reservations.)*

### Article 14.

The formal ratifications of this Convention shall be communicated to the Secretary-General of the League of Nations for registration. *(Ratifications, registration.)*

### Article 15.

1. This Convention shall be binding only upon those Members of the International Labour Organisation whose ratifications have been registered with the Secretary-General. *(Scope.)*

2. It shall come into force twelve months after the date on which the ratifications of two Members have been registered with the Secretary-General. *(Effective date.)*

3. Thereafter, this Convention shall come into force for any Member twelve months after the date on which its ratification has been registered.

### Article 16.

As soon as the ratifications of two Members of the International Labour Organisation have been *(Notification to Members.)*

été enregistrées, le Secrétaire général de la Société des Nations notifiera ce fait à tous les Membres de l'Organisation internationale du Travail. Il leur notifiera également l'enregistrement des ratifications qui lui seront ultérieurement communiquées par tous autres Membres de l'Organisation.

registered, the Secretary-General of the League of Nations shall so notify all the Members of the International Labour Organisation. He shall likewise notify them of the registration of ratifications which may be communicated subsequently by other Members of the Organisation.

## ARTICLE 17.

*Denunciation.*

1. Tout Membre ayant ratifié la présente convention peut la dénoncer à l'expiration d'une période de dix années après la date de la mise en vigueur initiale de la convention, par un acte communiqué au Secrétaire général de la Société des Nations, et par lui enregistré. La dénonciation ne prendra effet qu'une année après avoir été enregistrée.

*Extensions.*

2. Tout Membre ayant ratifié la présente convention qui, dans le délai d'une année après l'expiration de la période de dix années mentionnée au paragraphe précédent, ne fera pas usage de la faculté de dénonciation prévue par le présent article sera lié pour une nouvelle période de dix années, et, par la suite, pourra dénoncer la présente convention à l'expiration de chaque période de dix années dans les conditions prévues au présent article.

## ARTICLE 17.

1. A Member which has ratified this Convention may denounce it after the expiration of ten years from the date on which the Convention first comes into force, by an act communicated to the Secretary-General of the League of Nations for registration. Such denunciation shall not take effect until one year after the date on which it is registered.

2. Each Member which has ratified this Convention and which does not, within the year following the expiration of the period of ten years mentioned in the preceding paragraph, exercise the right of denunciation provided for in this Article, will be bound for another period of ten years and, thereafter, may denounce this Convention at the expiration of each period of ten years under the terms provided for in this Article.

## ARTICLE 18.

*Reports at 10-year Intervals.*

A l'expiration de chaque période de dix années à compter de l'entrée en vigueur de la présente convention, le Conseil d'administration du Bureau international du Travail devra présenter à la Conférence générale un rapport sur l'application de la présente convention et décidera s'il y a lieu d'inscrire à l'ordre du jour de la Conférence la question de sa revision totale ou partielle.

## ARTICLE 18.

At the expiration of each period of ten years after the coming into force of this Convention, the Governing Body of the International Labour Office shall present to the General Conference a report on the working of this Convention and shall consider the desirability of placing on the Agenda of the Conference the question of its revision in whole or in part.

ARTICLE 19.

1. Au cas où la Conférence adopterait une nouvelle convention portant revision totale ou partielle de la présente convention, et à moins que la nouvelle convention ne dispose autrement:

a) la ratification par un Membre de la nouvelle convention portant revision entraînerait de plein droit, nonobstant l'article 17 ci-dessus, dénonciation immédiate de la présente convention, sous réserve que la nouvelle convention portant revision soit entrée en vigueur;

b) à partir de la date de l'entrée en vigueur de la nouvelle convention portant revision, la présente convention cesserait d'être ouverte à la ratification des Membres.

2. La présente convention demeurerait en tout cas en vigueur dans sa forme et teneur pour les Membres qui l'auraient ratifiée et qui ne ratifieraient pas la convention portant revision.

ARTICLE 19.

*Revision of Convention, effect.*

1. Should the Conference adopt a new Convention revising this Convention in whole or in part, then, unless the new Convention otherwise provides,

(a) the ratification by a Member of the new revising Convention shall *ipso jure* involve the immediate denunciation of this Convention, notwithstanding the provisions of Article 17 above, if and when the new revising Convention shall have come into force;

(b) as from the date when the new revising Convention comes into force this Convention shall cease to be open to ratification by the Members.

2. This Convention shall in any case remain in force in its actual form and content for those Members which have ratified it but have not ratified the revising Convention.

ARTICLE 20.

Les textes français et anglais de la présente convention feront foi l'un et l'autre.

ARTICLE 20.

*Texts, authenticity.*

The French and English texts of this Convention shall both be authentic.

AND WHEREAS it is provided in Article 14 of the said draft convention that the formal ratifications thereof shall be communicated to the Secretary-General of the League of Nations for registration and in Article 15 that the convention shall come into force twelve months after the date on which the ratifications of two Members of the International Labor Organization have been registered with the Secretary-General of the League of Nations and that thereafter the convention shall come into force for any Member twelve months after the date on which its ratification has been registered;

AND WHEREAS the said draft convention was duly ratified on the part of the United States of America subject to understandings as follows: *U. S. ratification subject to understandings.*

"That the United States Government understands and construes the words 'vessels registered in a territory' appearing in

193470°—41—PT. II——30

this convention to include all vessels of the United States as defined under the laws of the United States.

"That the United States Government understands and construes the words 'maritime navigation' appearing in this Convention to mean navigation on the high seas only.

"That the provisions of this convention shall apply to all territory over which the United States exercises jurisdiction except the Government of the Commonwealth of the Philippine Islands and the Panama Canal Zone, with respect to which this Government reserves its decision."

Ratification by Belgium, registration.

AND WHEREAS the ratification of the said draft convention by Belgium was registered with the Secretary-General of the League of Nations on April 11, 1938, subject to subsequent decisions regarding application to the Belgian Congo and the territories under Belgian Mandate and the ratification thereof by the United States of America, subject to the understandings above recited, was registered with the Secretary-General on October 29, 1938;

Ratification by U. S., registration.

Effective date; scope.

AND WHEREAS by such registrations the said draft convention became a formal convention between the United States of America and Belgium on October 29, 1938, which, pursuant to Article 15 thereof, will come into force as between the United States of America and Belgium on October 29, 1939, twelve months after the date on which the ratification of the United States of America was registered with the Secretary-General of the League of Nations, and pursuant to the same Article, will come into force, for other Members of the International Labor Organization whose ratifications may have been or hereafter may be registered with the Secretary-General of the League of Nations subsequent to October 29, 1938, twelve months after the date on which the ratification has been or may be registered in each case;

Proclamation.

Now, THEREFORE, be it known that I, Franklin D. Roosevelt, President of the United States of America, have caused the said convention to be made public to the end that the same and every article and clause thereof may be observed and fulfilled in good faith by the United States of America and the citizens thereof, on and from October 29, 1939, subject to the understandings above recited and to any exceptions and any limitations of liability in accordance with the provisions of the convention which may be made by legislation or regulations on the part of the United States of America.

IN TESTIMONY WHEREOF I have hereunto set my hand and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this twenty-ninth day of September in the year of our Lord one thousand nine hundred and

[SEAL] thirty-nine and of the Independence of the United States of America the one hundred and sixty-fourth.

FRANKLIN D ROOSEVELT

By the President:
 CORDELL HULL
 *Secretary of State:*